STATE of Wisconsin, Plaintiff-Respondent,

v.

Elijah JONES, Defendant-Appellant.†

Court of Appeals

*No. 88-2291-CR. Submitted on briefs May 2, 1989.—Decided June 21, 1989.*

(Also reported in 444 N.W.2d 760.)

†Petition to review denied.

For the plaintiff-respondent the cause was submitted on the briefs of *Donald J. Hanaway,* attorney general, and *Paul Lundsten,* assistant attorney general.

For the defendant-appellant the cause was submitted on the briefs of *William J. Tyroler,* assistant state public defender.

Before Moser, P.J., Sullivan and Fine, JJ.

MOSER, P.J.   Elijah Jones (Jones) appeals from a judgment convicting him of one count of sexual assault, in violation of sec. 940.225(1)(d), Stats., and from an

order denying his sec. 809.30, Stats., motion for modification of his ten-year prison sentence, which was imposed pursuant to his conviction. We conclude that the trial court did not abuse its discretion by admitting certain "other acts" evidence at trial. Furthermore, the record before this court establishes that the trial court committed no abuse in determining Jones' sentence. Therefore, the judgment and order must be affirmed.

This case stems from events which occurred in the early morning hours of September 10, 1986. Testimony at trial established that Jones returned home after an evening of heavy drinking with friends. His wife, Jennifer, was asleep on a couch in the living room, and her eleven-year-old daughter, K.T., and her two sons were asleep in their bedroom. K.T. testified that she was awakened by Jones. He already had removed her clothing, told her to put on her bathrobe, and motioned for her to go into his exercise room, where he often slept. Over objection by defense counsel, K.T. stated that she knew Jones wanted to do "[w]hat he always do to me." K.T. went into Jones' room, where she claimed he placed his penis in her vagina. This sexual activity continued for approximately fifteen to twenty minutes, until Jones and K.T. heard Jennifer's movements in the next room. K.T. stated that Jones told her to leave his room, and that he left to find her mother.

Jennifer testified that she heard a child's whimper, awoke, and found that K.T. was in neither her bedroom nor the adjoining bathroom. Jennifer was met by Jones in the living room, and when she later went back into K.T.'s room, K.T. was in her bed. K.T. informed her mother of Jones' actions, and Jennifer brought her to Children's Hospital in Milwaukee for treatment. A physical examination established that K.T.'s vaginal diameter was three times the normal diameter of a girl her age,

and that the area below her vaginal opening showed signs of trauma. No semen or other physical evidence was found. Jones was later arrested, and charged with sexually assaulting K.T.

As noted above, K.T. maintained at trial that Jones had assaulted her on more than one occasion. Specifically, K.T. testified that Jones had placed his penis in her vagina on six or seven prior occasions. Jones' arresting officer testified that when initially arrested, Jones made statements to the effect that he had not engaged in intercourse with K.T., but that he had inserted his finger into her vagina and had done so on prior occasions when intoxicated. The prosecution was allowed to introduce this evidence of "other acts" to determine motive, plan and the general scheme of the crime. At trial, Jones denied any sexual contact with K.T. whatsoever.

The jury returned a guilty verdict on March 22, 1988. Judgment was entered accordingly and Jones was sentenced on July 1, 1988. In sentencing Jones to ten years of imprisonment, the trial court noted that both K.T. and her mother were devastated by Jones' conduct, so much that the family moved away from the community. The court also recognized that Jones: (1) had no prior record; (2) had no history of undesirable behavior patterns; (3) did not appear to be a vicious person; (4) was seeking help for his alcoholism; (5) had improved his employment record; (6) was twenty-nine years old; and (7) had limited education. The court also noted that until the sentencing hearing itself, Jones denied committing the assault against K.T., and thus took no responsibility for his actions and expressed no remorse.

The trial court also discussed the vicious and aggravated nature of Jones' crime. The court described it as "conduct that's so devastating to children and an innocent parent that it just cannot be allowed in a civilized

society." The court also noted that "[t]here's an entire school of thought with regard to the therapist and behavioral people that the first step of rehabilitation as far as the damaged victim is a substantial period of incarceration for the offender." One of the court's conclusory remarks was that it was "trying to tailor a sentence here to meet the needs of the defendant, the community and this little victim and her mother, . . .."

On November 22, 1988, Jones filed a motion to modify his sentence, pursuant to sec. 809.30, Stats. In support of his motion, Jones argued that the trial court abused its discretion by considering the "rehabilitative needs of the victim" factor in determining his sentence. This motion was denied in an order entered on December 6, 1988.

Jones now appeals from his judgment of conviction and sentence, and from the order of December 6, 1988. Jones brings two issues before this court: (1) whether the trial court abused its discretion by admitting the "other acts" evidence; and (2) whether the trial court abused its discretion by considering the above-noted sentencing factor.

## ADMISSION OF "OTHER ACTS" EVIDENCE

Appellant argues that evidence of his alleged prior sexual contacts with K.T. was wrongfully admitted by the trial court, because K.T. did not elaborate on the specific circumstances surrounding those contacts by providing the court with time and place details. Our review of this issue is governed by the "abuse of discretion" standard, and the trial court's decision to admit the "other acts" evidence will be upheld if it is in accordance with legal standards and facts of record, if the trial court undertook a reasonable inquiry and examination of

492

the underlying facts, and if there exists a reasonable basis for the determination.[1]

Section 904.04(2), Stats., "does allow admission of other acts evidence if used for specific purposes, such as proof of motive or identity."[2] To be admissible, the other acts evidence must be relevant to one of the statutory exceptions, and its probative value must substantially outweigh its prejudicial effect.[3] We note that "[t]he prejudice which must be avoided is the potential harm of a jury reaching the conclusion that because the defendant committed a bad act in the past, the defendant necessarily committed the current crime."[4] However, we further note that "Wisconsin historically has allowed the introduction into evidence of prior sexual acts by the accused with the same person who was the victim in the case being prosecuted."[5] Also, "a greater latitude of proof is to be allowed in the admission of other acts evidence in sex crime cases, particularly those involving a minor child."[6]

■

Our review of the record illustrates that the trial court reasonably inquired into the facts of the case, examined them and then applied the facts to proper legal standards. K.T.'s assertion that she had been assaulted six or seven times in the same manner as the assault

---

[1]*State v. Mink,* 146 Wis. 2d 1, 13, 429 N.W.2d 99, 104 (Ct. App. 1988).

[2]*Id.* at 12, 429 N.W.2d at 103.

[3]*Id.* at 13, 429 N.W.2d at 103; *State v. Schindler,* 146 Wis. 2d 47, 51–52, 429 N.W.2d 110, 112 (Ct. App. 1988); *See* sec. 904.03, Stats.

[4]*Mink,* 146 Wis. 2d at 17, 429 N.W.2d at 105.

[5]*State v. Conley,* 141 Wis. 2d 384, 399, 416 N.W.2d 69, 75 (Ct. App. 1987).

[6]*Mink,* 146 Wis. 2d at 13, 429 N.W.2d at 104.

which led to Jones' arrest is relevant to motive, plan and the general scheme of the crime. K.T.'s testimony suggested that on prior occasions, Jones sought sexual gratification by placing his penis into her vagina. These assaults took place in the home Jones shared with his wife and her three children.

Any possible prejudicial effect of the "other acts" evidence was offset by the trial court's instructions, which explained to the jury that such evidence was "admitted solely on the issue of opportunity, preparation or plan." Furthermore, the jury was informed of the State's burden to establish the truth of the other occurrences, and that the alleged other contacts could not be used to evaluate Jones' character. Finally, the jury was instructed that K.T.'s inability to remember particulars about Jones' prior sexual contacts could be used to assess her credibility.

Therefore, there exists a reasonable basis for admission of evidence of Jones' alleged prior sexual contacts with K.T., and we must affirm the trial court's decision. We also note that given the strength of the evidence against Jones, which included the testimony of K.T. and Jennifer, and the physical evidence produced from K.T.'s medical examination, if the trial court had been in error for admitting the "other acts" evidence, such error would have been harmless because there is no reasonable probability that the error contributed to Jones' conviction.[7]

## ABUSE OF SENTENCING DISCRETION

Appellant next argues that the trial court abused its discretion by considering the rehabilitative needs of

[7]See *State v. Dyess,* 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231–32 (1985).

K.T. as a sentencing factor. Appellant asserts that the "rehabilitative needs of the victim" is not a factor supported by legal precedent, and should thus not have been considered.

It is a well-settled principle of law in Wisconsin that sentencing is left to the discretion of a trial court, and that appellate review is limited to determining if an abuse of discretion has occurred.[8] The three primary sentencing factors a trial court must consider are: (1) the gravity of the offense; (2) the character of the offender; and (3) the need for the protection of the public.[9] Additional factors that the trial court may take into consideration are: (1) the past record of criminal offenses; (2) any history of undesirable behavior patterns; (3) the defendant's personality, character and social traits; (4) the results of a presentence investigation; (5) the vicious or aggravated nature of the crime; (6) the degree of the defendant's culpability; (7) the defendant's demeanor at trial; (8) the defendant's age, educational background and employment record; (9) the defendant's remorse, repentance and cooperativeness; (10) the defendant's need for close rehabilitative control; (11) the rights of the public; and (12) the length of pretrial detention.[10] An abuse of discretion might be found if the trial court failed to state on the record the factors influencing the sentence, or if it gave too much weight to one factor in the face of other contravening factors, but the weight given each of the factors is particularly within the discretion of the trial court.[11]

---

[8]*State v. Larsen,* 141 Wis. 2d 412, 426, 415 N.W.2d 535, 541 (Ct. App. 1987).

[9]*Id.* at 427, 415 N.W.2d at 541.

[10]*Id.* at 426-27, 415 N.W.2d at 541.

[11]*Id.* at 428, 415 N.W.2d at 542.

We now address the question of whether, under Wisconsin law, the "rehabilitative needs of the victim" is an appropriate factor for a trial court to consider in determining the sentence for a convicted criminal. We conclude that the "rehabilitative needs of the victim" is a logical extension of one of the secondary factors, i.e. the rights of the public. This is especially true in cases such as this, where a minor child has been the victim of a sexual crime, and where the trial court finds that significant incarceration of the perpetrator of that crime will have a positive influence on the child's recovery from its effects. While this factor is not deemed to rise to the level of consideration due a primary sentencing factor, it *may* be considered by a trial court where appropriate. In other words, the decision to consider the rehabilitative needs of a victim when sentencing a convicted offender is within the discretion of the trial court. Thus, the trial court here committed no abuse of discretion when it incorporated the rehabilitative needs of K.T. in its decision-making.

*By the Court.*—Judgment and order affirmed.

FINE, J. (concurring). Although I agree with most of the majority decision, I write separately to expand on one point, the use of victim impact considerations in sentencing, and to clarify another, the scope of Rule 904.04(2), Stats.

I.

In discussing sentencing factors, the majority holds that the rehabilitative needs of the victim "*may* be considered by a trial court where appropriate." Majority opinion at page 496 (emphasis in original). I believe that

496

the current state of the law makes it an appropriate consideration in *every* case.

" 'Two lives—the defendant's and the victim's—are profoundly affected by a criminal sentence. The court cannot make an informed decision on a just punishment if it hears only from one side.' " McLeod, *Victim Participation at Sentencing*, 22 Crim. L. Bull. 501, 506-507 (1986) (quoting President's Task Force on Victims of Crime, *Victims of Crime* (1982) [hereinafter President's Task Force]). In a similar vein, the United States Sentencing Commission has written that any sentence "should be effective, just, and efficient for the defendant, the victim, and society." United States Sentencing Commission, *Revised Draft Sentencing Guidelines* 2 (Jan., 1987).

Crime takes a terrible toll on its victims. A 1985 survey of crime victims in Kentucky, for example, reported the typical devastation left in crime's wake:

> Results made from the victimization study suggest that in the short term (within a year of the incident) victims of crime were significantly more depressed and more fearful than non-victims, victims of violent crime reported the highest level of depression and fear, and victims of multiple incidents of crime during one year reported higher levels of depression and fear than did those who reported only one crime incident or no crime. In the long term, the level of fear in victims continued to be higher than the level of fear in non-victims and the long-term effects of violence on fear of crime are more pronounced than are the long-term effects of experiencing property crime.

7 Criminal Justice Statistic Ass'n, Inc., *The CJSA Forum* 2 (May, 1989). The heart of the matter is a perception of helplessness that infuses victims with a sense of their own vulnerability. Zehr & Umbreit, *Victim*

*Offender Reconciliation: An Incarceration Substitute?,*
46 Fed. Probation 63, 64 (Dec., 1982). Thus, "[v]ictims
need to be given a voice and listened to if they are to
experience that restoration of power which is necessary
for psychological wholeness." *Ibid. Cf. Morris v. Slappy,*
461 U.S. 1, 14-15 (1983) (Sparing victim the potential
trauma of having to testify at new trial is an appropriate
factor to consider in deciding whether to reverse a con-
viction based on an alleged marginal violation of defen-
dant's constitutional rights because "courts may not
ignore the concerns of victims."). As the trial court and
we recognize, victim rehabilitation is assisted "by
responding to the victim's desire for retributive justice."
*McLeod, supra,* at 505.

Any sentencing decision must assess not only the
crime and the criminal but the needs of the community
as well. *See In re Judicial Administration: Felony Sen-
tencing Guidelines,* 120 Wis. 2d 198, 201, 353 N.W.2d
793, 795 (1984). As our decision in this case acknowl-
edges, we serve the community by accommodating the
rehabilitative needs of victims. Majority opinion at page
496.

Punishment tends to right the scales of justice that
have been set askew by crime. *See* President's Task
Force, *supra,* at 76-78. Charles E. Silberman has put it
this way: "We punish criminals, in short, because justice,
i.e., fairness, requires it; punishment is a way of restoring
the equilibrium that is broken when someone commits a
crime." C. Silberman, *Criminal Violence, Criminal Jus-
tice* 188-189 (1978). The efficacy of punishment thus
extends beyond the utilitarian goals of deterrence, inca-
pacitation, and rehabilitation:[1]

---

[1]The utilitarian aspects of punishment are clear:

A study conducted by Kenneth Wolpin (then at Yale) compared

"It is a mistake to consider the objects of punishment
as being deterrent or reformative or preventive, and

> what would happen if imprisonment was increased by 1% with what
> would happen if probation was increased by 1%. The conclusion was
> that twice as many crimes would be deterred by increasing imprison-
> ment. Similarly, a study by Michael Block at the University of Ari-
> zona concluded that moving a typical property offender from proba-
> tion to a two-year prison sentence would prevent 80 property crimes.

Abell, *The Costly Crisis in Corrections*, Wall St. J., Mar. 21, 1989,
editorial page. Incarceration not only reduces crime, it is cost
effective as well. Thus, a National Institute of Justice study has
shown that imprisonment of an additional 1,000 dangerous
criminals would cost $25 million more per year but would prevent
about 187,000 felonies, saving some $430 million in social costs
attributable to those crimes not committed. E. Zedlewski, *Making
Confinement Decisions*, National Institute of Justice, 4 (July,
1987).

> The conclusion [that the costs of crime far exceed the costs of incar-
> ceration to prevent it] holds even if there are large errors in the
> estimates: Doubling the annual cost of confinement, halving the
> average crimes per offender, and halving the average cost per crime
> would indicate that $50 million in confinement investments would
> avert $107 million in social costs.

*Ibid.* In contrast, efforts at non-coercive rehabilitation have
failed.

> No approach to rehabilitation seems to work. Whether offenders are
> given traditional one-to-one psychotherapy or newer methods of
> group therapy, they return to crime at about the same rate as those
> given no therapy at all. Nor are recidivism rates affected by educa-
> tion, vocational training, social work counseling, or any other
> approach that has yet been tried.

C. Silberman, *supra*, at 184. In fiscal year 1985, Wisconsin spent
a mere 1.5% of state and local direct expenditures for "correc-
tions," which "includes costs and employment for jails ["with
authority to hold prisoners beyond arraignment"], prisons, proba-
tion, parole, pardon, and correctional administration." Bureau of
Justice Statistics, U.S. Department of Justice, *Justice Expendi-
ture and Employment, 1985*, 6, 8 (Mar. 1987).

nothing else . . .. The truth is that some crimes are so outrageous that society insists on adequate punishment, because the wrongdoer deserves it, irrespective of whether it is a deterrent or not."

C. Silberman, *supra,* at 185 (quoting Lord Justice Denning of Great Britain). Thus, the Supreme Court has "long recognized that retribution itself is a valid penological goal of the death penalty," *South Carolina v. Gathers,* 490 U.S. —, —, 109 S. Ct. 2207, 2214 (O'Connor, J., dissenting), and that it " 'is an element of all punishments society imposes.' " *Ibid.* (quoting *Spaziano v. Florida,* 468 U.S. 447, 462 [1984]).

A victim's suffering is not only a good measure of the crime's seriousness but, indeed, is a useful gauge with which to determine appropriate punishment. *See* President's Task Force, *supra,* at 76–78. Thus, felony victims in Wisconsin are entitled "[t]o have the court provided with information pertaining to the economic, physical and psychological effect of the crime" and to *"have the information considered by the court."* Sec. 950.04(2m), Stats. (emphasis added).[2] Unless this information can actually affect the criminal's punishment, however, giv-

---

[2] Rule 32(c)(2)(D) of the Federal Rules of Criminal Procedure also requires that federal sentencing courts be given "an assessment of the financial, social, psychological, and medical impact upon, and cost" of the crime to the victim. *Ibid.* More than two/thirds of the states have similar provisions. McLeod, *supra,* at 507–508 n. 22.

On August 3, 1989, after this opinion was released, sec. 972.14(3), Stats., was enacted. 1989 Wis. Act. 31, sec. 2858e. Section 972.14(3)(a) provides: "Before pronouncing sentence in a felony case, *the court shall also allow a victim or family member of a homicide victim to make a statement or submit a written statement to be read in court.* The court may allow any other person to make or submit a statement under this paragraph. Any statement

ing victims this voice is a mere gesture without meaning or substance—a whisper into the wind—and would contravene this state's legislatively expressed policy. Just as tort defendants, guilty of only negligence, take those they injure as they find them and are responsible for ensuing damages even though those damages may be aggravated by the injured person's special susceptibility to harm, *Restatement (Second) of Torts* sec. 461 (1965); *Colla v. Mandella,* 1 Wis. 2d 594, 600, 85 N.W.2d 345, 349 (1957), criminals, who intentionally inflict harm, are also subject to penalty enhancement that will vary with the psychological needs of their victims. *Cf. Gathers,* 490 U.S. at —, 109 S. Ct. at 2214 (O'Connor, J., dissenting) ("That the harm caused by a defendant's actions is relevant to the capital sentencer's moral judgment concerning the appropriate penalty, even if the defendant did not specifically intend that harm, is a principle recognized both in the decisions of this Court, and in legislative decisions concerning appropriate levels of punishment.").[3]

---

under this paragraph must be relevant to the sentence." (Emphasis added.)

[3]The United States Supreme Court has prohibited consideration of so-called "victim impact statements" in capital cases. *Booth v. Maryland,* 482 U.S. 496, 502–503 (1987). This five to four decision was specifically limited by the majority to cases where the death penalty is at issue, *id.* at 507 n. 10, 509 n. 12. *Booth*'s demise, however, may be just below the horizon. Four justices have questioned its analysis, *Gathers,* 490 U.S. at —, —, 109 S. Ct. at 2212, 2217 (O'Connor, J., dissenting, joined by Rehnquist, C.J. and Kennedy, J.; Scalia, J., dissenting), and Justice White, a dissenter in *Booth,* 482 U.S. at 515, joined with the majority in *Gathers* only because the Court was not yet ready to overrule *Booth. See Gathers,* 490 U.S. at —, 109 S. Ct. at 2211 (White, J., concurring). Neither *Booth* nor *Gathers,* however, con-

In sum, I agree that victim rehabilitation was an appropriate sentencing consideration in this case. It is, in my view, appropriate in <u>every</u> case; the precise weight that should be given to the victim's rehabilitative needs will, of course, vary with the circumstances and any decision in that regard rests within the sentencing court's sound discretion.

## II.

In discussing Rule 904.04(2), Stats., the majority states: "To be admissible, the other acts evidence must be relevant to one of the statutory exceptions . . .." Majority opinion at page 493. This is misleading because it implies that the listed exceptions are exclusive rather than illustrative.[4] That is not the case. *State v. Bedker,* 149 Wis. 2d 257, 264–265, 440 N.W.2d 802, 804 (Ct. App. 1989); *State v. Shillcutt,* 116 Wis. 2d 227, 236, 341 N.W.2d 716, 720 (Ct. App. 1983), *aff'd on other grounds,*

---

cerned or considered punishment's rehabilitative effect on the victim, which is the issue before us here.

[4]The majority's statement is borrowed almost verbatim from *State v. Mink,* 146 Wis. 2d 1, 13, 429 N.W.2d 99, 103 (Ct. App. 1988): "Other acts evidence must pass a two-step test prior to being admissible. First, the evidence must be relevant to one of the statutory exceptions." *Id.* at 13, 429 N.W.2d at 103 (citation omitted). *Mink* cites *State v. Danforth,* 129 Wis. 2d 187, 202, 385 N.W.2d 125, 131 (1986) in support of this proposition. *Danforth* phrased the test's first prong in similar language: "First, the trial court must fit the evidence within one of the sec. 904.04(2), Stats., exceptions," *Danforth,* 129 Wis. 2d at 202, 385 N.W.2d at 131, as did *State v. Alsteen,* 108 Wis. 2d 723, 729, 324 N.W.2d 426, 429 (1982), upon which the *Danforth* court relied. None of these cases, however, concerned a situation where "other acts" evidence was excluded because it did not fit one of the designated cubbyholes.

119 Wis. 2d 788, 350 N.W.2d 686 (1984); 1 G. Joseph and S. Saltzburg, *Evidence in America,* ch. 14, sec. 14.2, at 3 (1987). Indeed, the rule's text is specifically *not* restrictive:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, *such as* proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 904.04(2), Stats., (emphasis added). Thus, for example, *State v. Pharr,* 115 Wis. 2d 334, 340 N.W.2d 498 (1983), recognized "that other crimes evidence is admissible '[t]o complete the story of the crime on trial by proving its immediate context of happenings near in time and place,' " *Id.* at 348, 340 N.W.2d at 504 (quoting *Bailey v. State,* 65 Wis. 2d 331, 347, 222 N.W.2d 871, 880 (1974)), even though complete-the-story evidence is not within the rule's listed examples. *Accord, Shillcutt,* 116 Wis. 2d at 236–237, 341 N.W.2d at 720.