STATE of Wisconsin, Plaintiff-Respondent,

v.

Jeremy D. RUSS, Defendant-Appellant.†

Court of Appeals

*Nos. 2004AP2869–CR, 2004AP2870–CR. Submitted on briefs September 29, 2005.—Decided December 21, 2005.*

2006 WI App 9

(Also reported in 709 N.W.2d 483.)

† Petition to review denied 3-15-06.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Martha K. Askins,* assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager,* attorney general, and *Christopher G. Wren,* assistant attorney general.

Before Brown, Nettesheim and Anderson, JJ.

¶ 1. BROWN, J. This case concerns a deaf person, Jeremy D. Russ, who was shackled during his plea and sentencing hearing and claims that his restraints substantially impeded his ability to communicate by sign language. But such a bare allegation is not borne out by the record. Despite an invitation by the court to let it know if any communication problems ensued, he never expressed any difficulty. Moreover, at the post-conviction hearing, he never called his interpreters to the stand, never called his trial attorney, and did not take the stand himself. Rather, he merely called an expert in sign language to testify that, generally speaking, shackles can inhibit sign language communication. That will not do. Russ had the burden to show that he in fact *was* unable to communicate, not that he theo-

retically might have had such difficulty. The burden is on him, not the State, to prove a communication lapse. He has failed to meet his burden. We affirm on this issue as well as on a sentencing discretion issue.

¶ 2.    This case has a long procedural history that need not be rehashed in this opinion. Suffice it to say, Russ had earlier been found to be incompetent due to being developmentally disabled. However, following a later contested competency hearing, he was found to be competent. Pursuant to a plea bargain, Russ agreed to plead guilty to one count of second-degree sexual assault and one count of lewd and lascivious exposure resulting from two separate complaints. Other counts were dismissed and read in.

¶ 3.    At the plea hearing, Russ' counsel requested the court to order Russ' handcuffs removed so that he could sign and communicate if he had questions. The court denied the request, stating that based on its observations from prior hearings, Russ communicates adequately with his hands even while shackled. The court did say it would reconsider the issue, however, if it became apparent during the course of the hearing that Russ could not communicate effectively. Russ had two interpreters at the hearing, and through the interpreters the court engaged Russ in a plea colloquy. The court accepted the pleas, observing that Russ' responses through the interpreters were "proper and intelligent responses to each of my questions" and again opined that based on the court's observations at this hearing and others, Russ could sign appropriately.

¶ 4.    Following a break, the court proceeded directly to sentencing. Defense counsel renewed her request to have Russ' handcuffs removed, and the court again denied that request. The court sentenced Russ to fifteen years' imprisonment on the sexual assault

charge and further ordered that it be served consecutive to a Milwaukee county conviction that he was then serving. The court imposed an additional nine-month consecutive sentence for the lewd and lascivious conviction, along with a restitution order of $160 to the victim of that charge. Russ subsequently filed for postconviction relief, asserting that the use of handcuffs impeded his ability to communicate to such a degree that it prevented him from being effectively present at the proceedings, denied him the right to assistance of counsel, and denied him due process. He also claimed that the sentence was too harsh.

¶ 5. The court ultimately denied the motion in all respects. The court opined that it had taken proper account of Russ' background, including his deafness and mental status. It discounted the expert's testimony as purely theoretical in that her testimony had not demonstrated any link between her theoretical assertions and the actual facts of Russ' case. Russ appeals both issues. We will address the communication claim first and the sentencing discretion issue second.

## USE OF SHACKLES ON A DEAF DEFENDANT

■

¶ 6. Russ asserts violations of three different rights: (1) his right to due process; (2) his right to be meaningfully present at the proceeding; and (3) his right to the assistance of counsel. A common theme he raises on all three grounds is the fact that he was handcuffed at the plea hearing and sentencing. He claims that because the court refused to remove his restraints, he was effectively rendered unable to communicate with his attorney and the interpreters in the courtroom. We are essentially left with the factual issue

of whether his shackles did in fact hinder his ability to communicate at the plea and sentencing hearing. We note that Russ seems to argue that the State bears the burden of proof on this issue. He states, "Jeremy Russ should have no more obligation to prove he could not actually adequately communicate than a hearing and speaking person should have to prove that by wiring his jaws shut or gagging him, he could not adequately communicate."

■■■■

¶ 7.   Which party bears the burden of proof presents a question of law for our de novo review. *Long v. Ardestani*, 2001 WI App 46, ¶ 36, 241 Wis. 2d 498, 624 N.W.2d 405. Whether a party has met its burden also presents a question of law that we review independently. *State v. Brown*, 2005 WI 29, ¶ 37, 279 Wis. 2d 102, 693 N.W.2d 715. We consider several factors in allocating this burden, including, (1) the natural tendency to place the burden of proof on the party seeking to change the status quo; (2) special policy considerations, such as those disfavoring particular defenses; (3) convenience; (4) fairness; and (5) the judicial estimate of probabilities. *See State v. Armstrong*, 223 Wis. 2d 331, 349 n.21, 588 N.W.2d 606 (1999), *modified*, 225 Wis. 2d 121, 591 N.W.2d 604 (Nos. 97–0925–CR and 97–0926–CR). Three of these factors predominate here, and they weigh heavily toward imposing the burden on Russ. First, it is Russ who seeks to challenge the status quo by asking for resentencing. Second, convenience and fairness warrant assigning the burden to Russ. "A doctrine often repeated by the courts is that where the facts with regard to an issue lie peculiarly in the knowledge of a party, that party has the burden of proving the issue." *See State v. McFarren*, 62 Wis. 2d 492, 500, 215 N.W.2d 459 (1974) (citation omitted). This

doctrine holds particularly true where the opposing party would have to prove a negative and where the fact to be proven relates personally to the accused. *Id.* at 500–01. Whether Russ attempted unsuccessfully to communicate with his counsel, his interpreters, or the court, relates personally to Russ and lies within his peculiar knowledge. Moreover, the State would have to prove a negative if we required it to show that Russ was never hindered in communicating with anyone. *Cf. Cooper v. State,* 565 N.W.2d 27, 29–31, 34 (Minn. Ct. App. 1997) (affirming conviction of a deaf defendant who claimed ineffective assistance of trial counsel for failure to use an interpreter at two-thirds of their pretrial meetings; noting that the defendant did not claim that he failed to impart any piece of information to his attorney).

¶ 8. *State v. Yang,* 201 Wis. 2d 725, 549 N.W.2d 769 (Ct. App. 1996), supports our conclusion. In *Yang,* the appellant contended that the trial court erred when it failed to make a determination that he had a language difficulty that hindered his ability to communicate with his attorney, to understand the proceedings, and to testify in English, such that he needed an interpreter. *Id.* at 728. In affirming the conviction, we placed particular emphasis on the testimony at the postconviction hearing: "Neither Yang's postconviction testimony nor that of trial counsel persuades us that the trial court's implicit finding that Yang could reasonably make himself understood in English is clearly erroneous." *Id.* at 739. We also noted that, "[t]he details he provided of his inability to communicate in English are few." *Id.* at 737–38.

¶ 9. We hold that Russ has failed to meet his burden. He called a single witness to testify at the October 19 postconviction hearing, and she was the sole

witness to testify for either party. This witness was a deaf woman who used American Sign Language as her native language and taught college courses on ASL. She explained that four factors, namely, palm orientation, handshape, location, and movement, were critical to effectively communicating through sign language. She placed particular emphasis on location of the hands. "For example," she explained, "the signs for boy and girl respectively must each occur on the head. You cannot, for example, use the sign for boy and place it at chest level. It would not be understood." Signing space for ASL users, according to this witness, includes the space "roughly between the pelvis and the top of the head, and then a few feet out from the signer's body." She opined that communication would be limited and difficult if a deaf person who used sign language were handcuffed and that in her experience, conversations with people in handcuffs were very stilted and frustrated: "I saw people going through great lengths to try to deliver a message that was always never completely free and good and accurate communication—but always had some level of difficulty." She further opined that trying to communicate with someone whose first language is not ASL would be "almost impossible." When asked whether she could give an opinion as to whether Russ had been able to sign adequately while shackled during the plea and sentencing hearing, however, she responded that she could not because she had not been there.

¶ 10. As the trial court observed, the expert's testimony—the only evidence presented at the postconviction hearing—was purely theoretical. It established that Russ could have had a very difficult time communicating information to others in the courtroom. Russ, however, must prove that he was *actually* prevented

from effectively communicating. Russ presented no evidence that the shackles hindered him from imparting any particular piece of information or from directing questions to anybody in the courtroom. Neither his trial counsel nor the interpreters took the stand to attest to their inability at any point during sentencing to understand Russ; nor did Russ give any testimony of his own. Moreover, despite the court's invitation to let it know if the restraints prevented Russ from communicating adequately, Russ never notified the court of any such difficulty either personally or through counsel.

¶ 11. Russ contends that although the State "defends the trial court's conclusion that Russ' arguments are nothing but 'theory' . . . the Supreme Court was not troubled by 'theory' in its just released decision about the shackling of a defendant during the sentencing phase of a capital murder trial. *Deck v. Missouri*, [544 U.S. 622, 125 S. Ct. 2007 (2005)]." Russ' reliance on *Deck* is misplaced. Although the court did comment that shackles could interfere with the right to communicate with counsel, *see id.* at 2013, this observation was dicta and not the reason the court vacated the sentence. Rather, the court was primarily concerned with the prejudicial effect of shackles. *See id.* at 2014. *Deck* involved the use of shackles in the presence of a *jury* in the sentencing phase of a capital murder case. *See id.* at 2009–10. Here there was no jury that the use of shackles could have prejudiced.

¶ 12. We wish to emphasize that we base our holding solely on Russ' failure to meet his burden of proof, not on the trial court's assessment of Russ' ability to communicate based on its personal observations in the courtroom. Although we considered such evidence relevant to our decision in *Yang*, *see Yang*, 201 Wis. 2d at 739, in that case the trial court heard Yang speak *in*

*English,* a language the court understood. Nothing in the record indicates that the court here understood Russ' sign language. All communication was filtered through interpreters. Thus, however appropriate and intelligent his responses may have seemed, the court had no way of knowing whether they were, in fact, responses to what the court actually said. Anything could have been lost in the translation, and the court was in no position to discern where any disconnect may have occurred.

## ALLEGATION OF MISUSE
## OF SENTENCING DISCRETION

¶ 13. Russ also asserts that the court erroneously exercised its discretion in imposing sentence. He complains that it imposed a harsh sentence and did not adequately explain its reasons for the sentence, as required by *State v. Gallion,* 2004 WI 42, 270 Wis. 2d 535, 678 N.W.2d 197. We disagree.

■■■

¶ 14. This court observes a strong policy of deferring to the sentencing discretion of a trial court, presuming the sentence to be reasonable unless the defendant can demonstrate from the record that the court acted unreasonably. *State v. Mosley,* 201 Wis. 2d 36, 43, 547 N.W.2d 806 (Ct. App. 1996). The sentencing court must address three primary sentencing factors, namely, the nature of the offense, the offender's character, and the need to protect the public, and may also consider any other relevant factors. *See State v. Harris,* 119 Wis. 2d 612, 623–24, 350 N.W.2d 633 (1984). The sentencing court has the discretion to balance the various factors as it sees fit. *State v. Jones,* 151 Wis. 2d 488, 495, 444 N.W.2d 760 (Ct. App. 1989). The court must, however,

explain the reasons for the particular sentence it imposes, providing a "rational and explainable basis" therefor. *Gallion*, 270 Wis. 2d 535, ¶¶ 39, 76 (citations omitted). The "rational and explainable basis" requirement allows this court to ensure that discretion was in fact exercised. *See id.*, ¶ 76.

■

¶ 15.   In explaining its rationale for these sentences, the court noted that the offenses were dangerous, violent offenses. Russ had grabbed two different women in a park and fondled them while they struggled to get free. These incidents occurred within days of each other. Moreover, it considered that Russ' illegal behavior in the cases before the court spanned from a period of 1996 through at least September of 2001. The court found several factors particularly important. First, it mentioned the nature of the offenses and described the first of the assaults. It analyzed that incident as follows:   "That's not a haphazard or an incidental contact. It's using force. It's using violence to maintain control of a woman. Similar type conduct is described in Count Two which occurred also at Frame Park." It then went on to recount the second incident and concluded, "That, too, is a violent, assaultive contact with a stranger in a park. It's not an incidental contact. It clearly wasn't meant to be a mistaken approach in an attempt to be friendly. It's assaultive. It's dangerous. It reflects poorly upon your character, two incidents within several days." Commenting further on Russ' character and the community's need for protection, the court observed Russ' impulsiveness.

> From everything that the Court knows about you, you're impulsive. You're not able to control your emotions, unable to control your desires.

> You deal with yourself, what your own needs are without regard to what is in the community, what community norms are . . . .
>
> Clearly, the community needs to be protected from you. It needs to be protected from the assaultive nature, from your inability to take care of yourself and to beha[ve]. Just to operate as a civil person in a park, to operate civilly, and within the norms of society of any place that you happen to be.

¶ 16. The court also expressed concern for Russ' rehabilitation but noted that any such rehabilitation was primarily Russ' responsibility and would have to occur in a controlled setting. "Society can do its part to rehabilitate you and give you the opportunities to make changes," the court explained, "But while that's happening, society has to know that you're not on the streets. You're not in a position to be assaultive and to conduct yourself violently toward others . . . . It's clear that you are unable to function in society without having severe controls which are only available within an incarcerated setting." In discussing Russ' impulsive nature, the court noted that it was taking into account Russ' background, which it had read in the various psychological reports it had received and which included "deprivations [Russ] may have suffered earlier in life." The court explained that it made the sentences consecutive for several reasons, including protection of the community, the nature of the offenses, and the fact that each offense was separate:

> I've made each of these sentences consecutive, first, because they are separate offenses. They are separate incidents, separate dangerous incidents, for which there must be separate punishment. A concurrent sentence on any of these matters diminishes the seriousness

of what's occurred and diminishes the protection the public will have from your future conduct.

¶ 17.   Contrary to Russ' claim that nowhere in the record did the court explain why a sentence of fifteen years would promote its goal of rehabilitation while protecting the public, the court did explain its rationale. It clearly stated that concurrent sentences would unduly diminish the seriousness of the offenses as well as public protection. We also reject Russ' implicit argument that a sentencing court must explain with mathematical precision why it chose the specific number of years. The court did not have to explain why twelve years would not do and why fifteen would. As we recently indicated in *State v. Fisher*, 2005 WI App 175, ¶¶ 21–22, 285 Wis. 2d 433, 702 N.W.2d 56, defendants are not entitled to this degree of specificity. Indeed, we noted that even in *Gallion* the supreme court had upheld a sentence in which the sentencing judge had not specifically explained how the factors before the court translated into a specific number of years. *See Fisher*, 702 N.W.2d 56, 21–22; *Gallion*, 270 Wis. 2d 535, ¶¶ 53–55. We affirm on this issue.

*By the Court.*—Judgments and order affirmed.

¶ 18.   ANDERSON, J. (*concurring*).   I fully agree with the majority opinion. I write separately to register some added concerns about the practice of routinely shackling or otherwise physically restraining defendants when they appear before a judge or jury.

¶ 19.   Before fleshing out these concerns, I wish to stress my understanding of the reasons behind Waukesha county's policy of routinely shackling defendants. The violent courtroom incidents that have taken place in Waukesha county, elsewhere in the State, and across the country have served as reminders that trial judges

often will need to take some sort of action to protect the jury, the courtroom personnel, the spectators, the defendants and the judges themselves. *See* Lisa Sink, *Fight costs Amaro bid for parole*, MILWAUKEE J. SENTINEL, August 15, 2000, *available at* http://www.jsonline.com/news/wauk/aug00/parole16081500a.asp (discussing "[o]ne of Waukesha County's most notorious criminals," Filemon Amaro Jr., who shot and killed two sheriff's deputies while appearing before Judge Neal Nettesheim in 1978); Gina Barton, *Ex-Deputy shot by defendant sues*, MILWAUKEE J. SENTINEL, April 18, 2005, *available at* http://www.jsonline.com/news/metro/apr05/319429.asp (exploring 2002 incident where the defendant, after being convicted of homicide and armed robbery, leapt into the jury box and gained control of a security officer's gun before being fatally shot by a police detective); Tom Kertscher, *Judge calls for talks on whether guns should be banned in court*, MILWAUKEE J. SENTINEL, May 29, 2002, *available at* http://www.jsonline.com/news/metro/may02/47183.asp (citing several instances of courtroom violence in Milwaukee area history); *Atlanta courthouse killer hunted*, March 11, 2005, *available at* http://www.jsonline.com/news/nat/mar05/308964.asp (discussing a March 2005 incident at an Atlanta courthouse where a rape suspect overpowered a sheriff's deputy and used her gun to kill a judge, a court reporter and a second sheriff's deputy). Bearing in mind the tragedy that can result if judges do not have the ability to protect themselves and their courtrooms, *see Deck v. Missouri*, 125 S. Ct. 2007, 2014 (2005), I turn to the problems that accompany the decision to physically restrain defendants on a routine basis.

¶ 20. Courts have recognized the danger to a criminal defendant in being required to appear before a jury in physical restraints. *See id.* at 2012–13 (discuss-

ing "judicial hostility to shackling"). In particular, courts have found that the appearance of the defendant in restraints would prejudice the jury, causing jurors to believe that the person was dangerous thereby impairing the presumption of innocence. *See Illinois v. Allen,* 397 U.S. 337, 344 (1970); *United States v. Zuber,* 118 F.3d 101, 103 (2d Cir. 1997); *Duckett v. Godinez,* 67 F.3d 734, 747 (9th Cir. 1995).

¶ 21. Thus, in order to comport with due process, courts have held that the presiding judge must engage in a two-step process before approving the use of physical restraints on a defendant in a jury trial. *See Zuber,* 118 F.3d at 103; *Duckett,* 67 F.3d at 748. First, a presiding judge must perform an independent evaluation of the need to restrain the party for purposes of maintaining security and order in the courtroom. *See Zuber,* 118 F.3d at 103; *Duckett,* 67 F.3d at 748. This independent evaluation may require an evidentiary hearing. *See Zuber,* 118 F.3d at 103. Second, where restraints are deemed necessary, the presiding judge must take steps to limit their prejudicial effect, including a consideration of less restrictive alternatives. *See id.; Duckett,* 67 F.3d at 748; *Spain v. Rushen,* 883 F.2d 712, 721 (9th Cir. 1989). Some courts have held that these requirements apply with equal force in the context of jury sentencing—that is, where juries perform the task of imposing or recommending a particular sentence. *See Zuber,* 118 F.3d at 103; *Duckett,* 67 F.3d at 746–47. *See also Deck,* 125 S. Ct. at 2014–15 (holding "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding"). Courts, however, have declined to extend the rule requiring an independent, judicial evaluation of the need to restrain a party in court to the context of nonjury sentencing

proceedings. *See Zuber*, 118 F.3d at 104. This is in part because juror bias constitutes the paramount concern justifying these requirements and we traditionally assume that trial judges, unlike juries, are not prejudiced by impermissible factors. *See id.*

¶ 22.    However, the possibility that jurors will be prejudiced by the presence of physical restraints is not the sole rationale for placing strict limitations on their use in court. Courts have offered numerous reasons for holding that defendants should be in physical restraints only in extraordinary cases. They include:

> (1) Physical restraints may cause jury prejudice, reversing the presumption of innocence;
>
> (2) Shackles may impair the defendant's mental faculties;
>
> (3) Physical restraints may impede the communication between the defendant and his [or her] lawyer;
>
> (4) Shackles may detract from the dignity and decorum of the judicial proceedings; and
>
> (5) Physical restraints may be painful to the defendant.

*Spain*, 883 F.2d at 721 (citation omitted). These concerns, with the exception of the first, are all potentially present when a defendant appears in court before a trial judge. This is especially true in a case such as the one before us here where a defendant is physically or mentally handicapped.

¶ 23.    In light of these additional concerns, I suggest that physically restraining a defendant regardless of whether he or she is appearing before a judge or a jury should be the exception, saved only for extraordinary cases, rather than the rule. *See Allen*, 397 U.S. at 344 (shackles should only be used as a "last resort"). I

encourage trial judges to exercise discretion in ordering a defendant to be physically restrained not only during a trial, but also during plea taking and sentencing. In the exercise of their discretion, judges should assess the extent of the limitations that would be present if restraints were applied, taking into consideration all of the potential problems listed above, and then weigh the benefits and burdens of restraining against other possible less restrictive alternatives. *See Spain*, 883 F.2d at 721. An approach such as this, where the particularities of each individual case are assessed, strikes the proper balance between maintaining the safety and security of those in the courtroom and upholding the defendant's constitutional rights.