STATE of Wisconsin, Plaintiff-Respondent,

v.

Xiong YANG, Defendant-Appellant.†

Court of Appeals

*No. 95–0583–CR. Submitted on briefs March 11, 1996.——Decided April 18, 1996.*

(Also reported in 549 N.W.2d 769.)

†Petition to review denied.

For the defendant-appellant the cause was submitted on the briefs of *Margaret A. Maroney*, assistant state public defender.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Sharon Ruhly*, assistant attorney general.

Before Dykman, Sundby and Vergeront, JJ.

VERGERONT, J. Xiong Yang appeals from a judgment of conviction for sexual assault of a child contrary to § 948.02(1), STATS., and an order denying his request for a new trial. Yang contends that the trial court erred in failing to make a determination under § 885.37(1), STATS., that he had a language difficulty that interfered with his ability to communicate with his attorney, understand the proceedings and testify in English, and, therefore, needed an interpreter. He also contends that his trial counsel was ineffective for failing to obtain an interpreter for him. Finally, he asks for a remand for a determination whether his trial counsel was ineffective for failing to consult with him about an individual polling of the jury.

We conclude that the trial court had notice before the trial of a language difficulty such that the court was required to make a determination under § 885.37(1)(b), STATS., whether an interpreter was necessary. However, we also conclude that the court's

728

postconviction determination that Yang's language difficulty was not sufficient to make an interpreter necessary is not clearly erroneous. For that reason, we reject Yang's claim that his trial counsel was ineffective for failing to obtain an interpreter. We also decide that Yang is not entitled to a remand on the jury polling issue. We therefore affirm.

## BACKGROUND

Yang was born in Laos in 1960 and moved to the United States in 1980. After his arrival in the United States, he continued to speak Hmong at home. He took beginning-level English courses at a technical college and enrolled in a welding course designed for Hmong individuals. With the assistance of the minority coordinator at the technical college, Yang obtained a welding job in 1988 at the Toro Company and remained employed there until 1993.

Yang met Paulette A. in 1986, and they had a relationship lasting until July 1992, with periods of living together and periods of separation. Paulette does not speak Hmong. Paulette and Yang had three children together. Paulette had three other children, one named Adrian. On August 30, 1992, Adrian, then eight years old, told Paulette that Yang had sometime previously put his penis in or on her buttocks. Yang was charged with the sexual assault of Adrian.

The court appointed counsel for Yang. Jury selection was scheduled for January 11, 1993, with the trial to begin on January 12, 1993. Yang did not appear on January 11 in court, and the trial court issued a warrant. Yang appeared the next day in court with his counsel. Counsel explained that he had found Yang at work. Yang indicated to counsel that he knew the trial was scheduled for that week but did not realize he had

to be in court on January 11. Counsel stated that he thought it was a miscommunication and that it was likely that Yang should have an interpreter for the trial because the language problems were greater than he had initially perceived.

Yang's counsel did not mention the issue of an interpreter again to the court, and the trial took place on May 11, 1993, without an interpreter. The testimony of all the witnesses for the State was in English. Yang was the only witness for the defense. He testified at trial in English and denied having any sexual contact with Adrian. Through cross-examination of the State's witnesses, defense counsel brought out that Adrian had not mentioned Yang to professionals who interviewed her before August 30, 1992, about possible sexual abuse, even though the incident Yang was charged with had already occurred. The defense also attempted to show that Paulette was extremely jealous of Yang, and was preoccupied with child sexual abuse because she had been abused as a child and Adrian knew this.

The jury found Yang guilty. In his postconviction motion, Yang alleged that the trial court erred in not conducting an inquiry to determine if an interpreter was necessary; that defense counsel was ineffective for failing to obtain an interpreter; and that the real controversy was not fully and fairly tried because of the lack of an interpreter. After the evidentiary hearing, at which a Hmong interpreter translated, the trial court denied the postconviction motion. The court concluded that it was not required to make a determination on the necessity of an interpreter before trial because defense counsel had not requested one. It also determined that Yang had not needed an interpreter.

## OBLIGATION TO DETERMINE NEED FOR INTERPRETER

**[1]**

Whether the trial court erred in not conducting an inquiry before trial to determine if an interpreter was necessary requires a construction of § 885.37(1), STATS. The interpretation of a statute is a question of law, which we review de novo. *Tahtinen v. MSI Ins. Co.*, 122 Wis. 2d 158, 166, 361 N.W.2d 673, 677 (1985). Section 885.37(1)(b) provides in part:

> If a court has notice that a person [charged with a crime] has a language difficulty because of the inability to speak or understand English . . . the court shall make a factual determination of whether the language difficulty . . . is sufficient to prevent the individual from communicating with his or her attorney, reasonably understanding the English testimony or reasonably being understood in English. If the court determines that an interpreter is necessary, the court shall advise the person that he or she has a right to a qualified interpreter and that, if the person cannot afford one, an interpreter will be provided for him or her at the public's expense.

Yang argues that the trial court had notice of his language difficulty because of the misunderstanding concerning his appearance at jury selection and his counsel's comments to the court on January 12, 1993. The State responds that the trial court did not have notice because no evidence was presented to the court giving rise to a reason to doubt Yang's competence in English. The State relies on cases concerning a defendant's competency to stand trial, such as *State v. Weber*, 146 Wis. 2d 817, 433 N.W.2d 583 (Ct. App. 1988), in which we held that before mental competency

731

proceedings are required, evidence giving rise to a reason to doubt competency must be presented to the court. *Id.* at 823, 433 N.W.2d at 585. We agree with Yang that the trial court had notice of Yang's difficulty with English before trial.

■

Section 885.37, STATS., codifies the obligation to provide an interpreter that was established in *State v. Neave*, 117 Wis. 2d 359, 344 N.W.2d 181 (1984). *State Public Defender v. Dane County Cir. Ct.*, 184 Wis. 2d 860, 868, 517 N.W.2d 144, 147 (1994). We therefore look to *Neave* for guidance in construing the phrase "[i]f a court has notice that a person [charged with a crime] has a language difficulty." In *Neave*, the court adopted the rule that a criminal defendant must have the assistance of an interpreter when needed, at public expense if the person is unable to pay; and that this right is personal to the defendant and may be waived only by the defendant personally. *Neave*, 117 Wis. 2d at 366, 375, 344 N.W.2d at 184, 189. The court adopted this rule "as a matter of judicial administration, and to avoid questions of effective assistance of counsel and questions of whether inability to reasonably understand testimony resulted in a loss of an effective right to cross-examination." *Id.* at 365, 344 N.W.2d at 184.

The *Neave* court's language in describing the procedure is essentially tracked in the statute:[1]

---

[1] The *Neave* court in this quoted passage did not include, as one ground for needing an interpreter, the ability of the defendant to make himself understood in English. That was not an issue in *Neave*, apparently because Neave did not testify. *State v. Neave*, 117 Wis. 2d 359, 362 n.2, 344 N.W.2d 181, 183 (1984). But elsewhere in the opinion, the court acknowledged

> [W]henever a trial court is put on notice that the accused has a language difficulty, the court must make a factual determination of whether the language disability is sufficient to prevent the defendant from communicating with his attorney or reasonably understanding the English testimony at the preliminary hearing or trial.

*Id.* at 375, 344 N.W.2d at 188-89 (footnote omitted). Although the court in *Neave* did not expressly define "put on notice," its discussion indicates what it intended by the term. In describing the trial court proceedings, the *Neave* court noted that "the trial judge . . . was aware of the defendant's language disability," because of a statement by the district attorney at the preliminary hearing that the defendant spoke Spanish quite exclusively and spoke very little English. *Id.* at 363, 344 N.W.2d at 183. The court also framed the issue as "whether the trial court was reffectively alerted to the need for an interpreter." *Id.* at 368, 344 N.W.2d at 185.

We also find instructive the *Neave* court's explanation of the nature of the determination the trial court must make once it has notice of a language difficulty:

> A hearing to determine the defendant's ability to understand English need not be elaborate. Normally the court should be able to decide whether an interpreter is necessary by simply asking a few questions. If the court suspects fraud, other testimony may be necessary to establish the extent of defendant's ability to speak English.

that this is a reason for needing an interpreter, *see id.*, and the statute clearly includes this ground.

*Neave*, 117 Wis. 2d at 375 n.6, 344 N.W.2d at 189 (citation omitted).

There is nothing in *Neave* or § 885.37, STATS., to suggest that a court has an obligation to determine the need for an interpreter only if defense counsel makes a request or presents evidence of the need. The inquiry envisioned by the *Neave* court to determine the need for an interpreter is significantly different from the more elaborate hearing prescribed by statute "whenever there is reason to doubt a defendant's competency to proceed." Section 971.14(1)(a), STATS. That hearing involves, among other requirements, a mandatory examination by one or more persons having specialized knowledge and a detailed written report. Section 971.14(2) and (3) . The threshold showing required to obtain such an examination and hearing is not a useful analogy to this situation.

We conclude that a court has notice of a language difficulty within the meaning of § 885.37(1)(b), STATS., when it becomes aware that a criminal defendant's difficulty with English may impair his or her ability to communicate with counsel, to understand testimony in English, or to make himself or herself understood in English. At that point, the court has an obligation to make the factual determination on the need for an interpreter required under § 885.37(1)(b).

We appreciate the trial court's concern with minimizing unnecessary and premature determinations on the need for an interpreter. However, since the determination does not require an elaborate proceeding, we believe our interpretation of § 885.37(1), STATS., will aid judicial administration by establishing the need for an interpreter, if there is one, earlier rather than later in the criminal process.

Because the trial court's obligation does not hinge on a request by counsel, questions of effective assistance of counsel in this area will be minimized.

We also conclude that the trial court had notice on January 12, 1993, that Yang had a difficulty with English that might impair his ability to communicate with counsel, understand English or be understood in English. Counsel's statements on that date were notice to the court of a language difficulty sufficient to trigger a determination of whether Yang needed an interpreter.

## NEED FOR INTERPRETER

■ Yang implicitly concedes that even if the court erred in not determining the need for an interpreter, he is not entitled to a new trial unless he did need an interpreter. Yang argues that the trial court's postconviction determination that he did not need an interpreter is based on clearly erroneous findings of fact. As Yang recognizes, the standard of our review of a trial court's findings of fact places a heavy burden on the challenger. We do not set aside a trial court's finding unless it is clearly erroneous, and we must give due regard to the trial court's opportunity to judge the credibility of the witnesses. Section 805.17(2), STATS.

The court found that Yang did not have a language difficulty that prevented him from communicating with his attorney or from reasonably understanding the questions asked of him at trial. Implicit in the trial court's determination are also findings that Yang reasonably understood the English testimony at trial and that he was able to make himself reasonably understood in English. *See Schneller v. St. Mary's Hospital Medical Ctr.*, 162 Wis. 2d 296, 311-12, 470

N.W.2d 873, 879 (1991) (a trial court's finding of fact may be implicit from its ruling). The court also found that Yang had "faked" the results of tests administered by a psychologist for purposes of creating grounds for the postconviction motion.[2] The trial court therefore did not credit the test results—which showed a high score on a non-language intelligence test but low scores on tests requiring a knowledge of English—or the opinion of the psychologist based on the test results.[3] The psychologist's opinion was that Yang did not have sufficient comprehension of English or receptive and expressive vocabulary to adequately communicate with his attorney or reasonably understand English testimony.

The court based its findings on Yang's actual testimony at trial; on Paulette's testimony at the postconviction hearing that Yang communicated exclusively in English with her and her family, friends and members of a soccer team during the six years of their relationship; and on trial counsel's testimony.

The court properly emphasized in its analysis the transcript of Yang's testimony at trial.[4] There are, as

---

[2] In April 1994, Dr. Robert Barron, a psychologist, interviewed Yang using an interpreter and administered several tests.

[3] Yang scored at the level of a child of four years and one month in vocabulary; at the 2.4 grade level in reading; and at the 4.6 grade level in spelling. Dr. Barron also testified with respect to Yang's reading skills, but that is not an issue in this case.

[4] We agree with Yang that in *State v. Neave*, 117 Wis. 2d 359, 344 N.W.2d 181 (1984), the court granted the defendant a new trial because Neave needed an interpreter to understand the English testimony at trial, was not informed of his right to one, and did not waive that right. The *Neave* court did not engage in a harmless error analysis. We do not do so either.

Yang points out, occasions on which he said he did not understand a question or a term. But with an explanation he was able to answer the question. There are also frequent mistakes in grammar, but his answers are understandable. It is not apparent from reading his testimony that there is any significant point on which he did not understand a question or could not make himself understood. Of course, there may have been misunderstandings not evident from Yang's trial testimony, or it may be that Yang was unable to explain things he wanted to say. We therefore have reviewed carefully Yang's postconviction testimony, given through an interpreter, as well as his trial counsel's testimony.

Yang testified at the postconviction hearing that he brought his brother with him to meet with his attorney on two occasions to help him communicate with his attorney. He also brought his uncle. He asked his brother to translate at the trial for him, but his brother could not because of his classes. Yang testified that he did not say much at the trial because he did not feel he would be understood; he did not understand many questions; he did not understand the questions his attorney asked at times; and there was no time to ask his attorney to explain. Had he known he had the right to an interpreter, he would have asked for one.

Yang provided no details at the postconviction hearing of what he misunderstood at trial. The details

---

However, we do consider Yang's trial testimony and subsequent testimony of what he did not understand and was not able to say at trial because that is pertinent to the question of whether he needed an interpreter. In *Neave*, there was apparently no dispute over Neave's need for an interpreter to understand the trial proceedings. *Neave*, 117 Wis. 2d at 362 n.2, 363, 344 N.W.2d at 183.

he provided of his inability to communicate in English are few. He testified that he wanted to tell his attorney that a note he wrote referencing sex with females other than Paulette was written when he and Paulette were separated. This note was introduced at trial by the district attorney to show that Paulette had reason to be jealous of Yang. Yang had not known it was going to be introduced, and he did not know how to explain the note to his attorney during the trial.

Yang also testified that he wanted to explain more details at trial about an incident that took place at a motel in Rochester, Minnesota, while he and Paulette were there for medical treatment for one of their children. Adrian testified at trial that she was staying at the motel and asked Yang to rub her back. She stated that Yang then touched her buttocks with his hand under her clothes.[5] Yang testified at trial that he remembered Adrian asking him to rub her back when they were at the motel. He stated that he did rub her back, but he did not touch her buttocks. Yang did not explain, even with an interpreter, what else he wanted to say at trial about the Rochester incident.

Yang's trial counsel testified that prior to trial, he did at times feel that Yang did not understand him and that they would have to go over issues more than once. There were also some misunderstandings with Yang about court proceedings, which counsel described. Counsel thought about obtaining an interpreter, but he felt the problem was more one of communication skills than language ability on Yang's part. Counsel was very

---

[5] Adrian testified that the incident giving rise to the criminal charge occurred in Paulette's apartment on Miller Street in La Crosse, when she was in the second grade. The incident at the Rochester, Minnesota motel occurred later, and was admitted as other acts evidence.

frustrated at trial because Yang's explanations at trial were inadequate and just did not "flow"; Yang did not include things that counsel thought Yang understood were important. Counsel could not remember details about what Yang did not say, although he did recall Yang had more fully explained the Rochester incident to him before trial—something to do with the timing of the trip to Rochester. If counsel had felt an interpreter was necessary for the trial, he would have demanded one and he knew one would have to be made available. He now thinks that it would have been better tactically to have an interpreter at the trial because Yang came across flat in his non-verbal communication; with an interpreter, the jury might have understood there was a reason for that other than lack of concern by Yang. Yang did say to him that he had not been able to tell the whole story at trial, but the examples counsel could remember had to do with evidence the court ruled inadmissible.

Neither Yang's postconviction testimony nor that of trial counsel persuades us that the trial court's implicit finding that Yang could reasonably make himself understood in English is clearly erroneous. As for Yang's ability to understand the English testimony, Yang's argument focuses on his inability to understand questions asked of him. Yang does not point to the testimony of other witnesses that he was unable to understand. The trial court found, and the record supports, that Yang reasonably understood what was being asked of him, judging by the appropriateness of his responses. There were, as we have said above, instances when Yang said he did not understand a question or term. But, as the trial court noted, that is not unusual for a witness. There are also a few instances when Yang's answer is not responsive or

shows he may not have understood the question even though he did not say so. However, the number and nature of these in the context of all of Yang's testimony does not show that he did not reasonably understand the questions asked of him.

With respect to Yang's ability to communicate with trial counsel, the court considered trial counsel's testimony as evidence that Yang was able to generally communicate with him, in spite of some misunderstandings. The court noted that trial counsel's frustration over Yang's testimony at trial was not unusual because clients sometimes testify differently than how they have indicated to counsel they will. The court placed significance on counsel's testimony that he knew if an interpreter were needed, one would have been provided. Although there are portions of trial counsel's testimony that might support a contrary finding, his testimony supports the court's implicit finding that Yang's difficulty with English did not prevent him from communicating with his attorney. Yang's testimony on his difficulty in communicating with his attorney is general, with only the few details we have already mentioned. Some instances of misunderstanding or lack of communication do not require a finding that Yang was prevented by a language disability from communicating with his attorney.

We have also considered the other testimony Yang presented at the postconviction hearing, not mentioned by the court. The testimony of Yang's English instructor and the minority affairs coordinator at the technical college concerned the time period before and during Yang's first year of employment at Toro, which was 1988. The testimony of Yang's supervisor and co-worker at Toro shows that Yang had some difficulty

with English, but also that he functioned effectively in a work place where only English was spoken. Yang's brother described the two times he met with Yang and his attorney and translated the attorney's questions for Yang.[6]

The trial court had the opportunity to hear Yang testify at trial and observe him throughout the trial, as well as the opportunity to observe the witnesses who testified at the postconviction hearing. A significant basis for the court's findings was its determination that Yang's understanding of English displayed at the trial was greater than that he displayed at a later date, when he had a motive to minimize the depth of his understanding. The court placed more reliance on its own observations than it did on the psychologist's testimony that he was confident Yang was not "faking" on the tests.[7] The court also credited Paulette's description of the various ways Yang functioned in exclusively English-speaking environments over a number of years. Giving appropriate deference to the

---

[6] Yang also submitted his prison records describing his academic skills in August 1993 as "Minimal Skills/Illiterate-A[dult] B[asic] E[ducation] Needed—E[nglish] [as a] S[econd] L[anguage] Needed," and his Adult Basic Learning Examination test results dated May 27, 1994. It is not readily apparent what these documents show about Yang's ability to speak and understand spoken English in the pretrial and trial context.

[7] Dr. Barron testified that he was confident Yang was not faking in taking the tests because of his experience in making clinical observations of malingerers; because Yang's responses showed a pattern of increasing failure with increasing difficulty of questions, even though difficult and easy items were mixed; and because Yang tested in the superior range on the non-English language test.

trial court's assessment of credibility, we cannot say that the trial court's findings are clearly erroneous.

This conclusion disposes of Yang's ineffective assistance of counsel claim. Since the trial court's finding that Yang did not need an interpreter is not clearly erroneous, Yang cannot meet his burden of proving that trial counsel was deficient in not asking for an interpreter or that Yang was prejudiced by the failure to request an interpreter. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (defendant must prove both deficient performance and prejudice).

Yang requests that we exercise our discretionary power of reversal under § 752.35, STATS., because the real controversy has not been tried. We decline to do so. We are not persuaded by Yang's argument that the jury was confused or misunderstood, or that Yang did not present crucial evidence about the incident in Rochester because of his difficulty with English. In Yang's postconviction testimony with an interpreter, he does not say that his trial testimony about the Rochester incident was inaccurate or a mistake, and he does not explain what else he wanted to say.

## JURY POLLING

Yang contends that he was denied effective assistance of counsel because his trial counsel failed to inform him of his right to poll the jurors individually and failed to consult with him before waiving this right. The right to poll jurors individually is such a significant right, Yang argues, that counsel is deficient as a matter of law if he or she fails to consult the

defendant before waiving this right. Yang asks for a remand for an evidentiary hearing on this issue.[8]

Yang was present with his counsel when the jury returned the verdict. After the clerk read the verdict of guilty, the court asked the jurors to raise their right hands if this "is the verdict of each of you." The court noted on the record that all twelve jurors raised their right hands. The court asked defense counsel whether there was any reason to poll the jury and he answered "no." Yang's affidavit avers that his trial counsel did not tell him that he had a right to individually poll the jury; that he did not know he had a right to individually poll the jury; and that he did not understand what the judge meant when he asked trial counsel whether there was any reason to poll the jury.

---

[8] The procedural history of this issue is complex. Yang did not raise this issue in his postconviction motion. On July 6, 1995, this court decided *State v. Reichling*, No. 94-1818-CR, unpublished slip op. (Wis. Ct. App. July 6, 1995), in which we held that the decision whether to poll jurors individually was personal to the defendant, and defense counsel's performance was deficient if he or she failed to inform the defendant of this right. We also held that prejudice was presumed in such a situation. On August 7, 1995, we granted Yang's motion to stay his appeal and for a remand to permit him to raise the jury polling issue in a postconviction motion. We then withdrew the *Reichling* opinion and, on September 28, 1995, we reissued our opinion. In our reissued opinion, we held that when defense counsel is present with the defendant when the jury returns its verdict, failure to explain the right to poll jurors individually is not, in itself, deficient performance. *State v. Reichling*, No. 94-1818-CR, unpublished slip op. (Wis. Ct. App. Sept. 28, 1995). The State then requested that we rescind our August 7 stay and remand order in this case, and we granted that motion. However, we did permit Yang to raise his request for a remand in his appellate reply brief.

An attorney's performance is not deficient if it is reasonable under prevailing professional norms and considering all the circumstances. *Strickland*, 466 U.S. at 688. The purpose of an evidentiary hearing is to permit trial counsel to testify on the reasons for the alleged deficient performance so that the trial court can determine whether the challenged actions were the result of incompetence or deliberate trial strategies. *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905, 908 (Ct. App. 1979). A defendant is not entitled to an evidentiary hearing if the motion does not allege sufficient facts to raise a question of fact concerning deficient performance, or if the record conclusively demonstrates that the defendant is not entitled to relief. *See State v. Washington*, 176 Wis. 2d 205, 214-15, 500 N.W.2d 331, 335-36 (Ct. App. 1993). Taking as true the facts averred in Yang's affidavit supporting his motion for remand, we conclude that he is not entitled to relief on his claim for ineffective assistance of counsel.

In *State v. Jackson*, 188 Wis. 2d 537, 525 N.W.2d 165 (Ct. App. 1994), we held that when a defendant is represented by counsel at the time the jury returns its verdict, the trial court need not find that the defendant knowingly and voluntarily consented to trial counsel's waiver of his or her right to poll the jurors individually. We also concluded: "Jackson was represented by counsel when the verdict was entered, and the decision to assert or waive certain rights, including whether to poll the jury, was delegated to that counsel." *Id.* at 542-43, 525 N.W.2d at 168. We read *Jackson* as holding that the decision whether to request an individual polling is one delegated to counsel.

744

Because the decision whether to request an individual polling is one delegated to counsel, we decline to hold that counsel's failure to inform a defendant of the right to an individual polling is, in itself, deficient performance. The right to an individual polling of the jury is a significant right because it is a means to test the uncoerced unanimity of the verdict. *State v. Behnke*, 155 Wis. 2d 796, 801, 456 N.W.2d 610, 612 (1990).[9] But it is not the only method for assuring a unanimous verdict. The standard jury instruction tells the jury that the verdict must be unanimous, and that all twelve jurors must agree to arrive at a verdict.[10] When the trial court reads the verdict, it may ask the jurors as a group, as it did in this case, if it is the verdict of each one.

We conclude the better rule is that when defense counsel is present at the return of the jury verdict and does not request an individual polling, whether counsel's performance is deficient depends on all the circumstances, not simply on whether counsel

---

[9] In *State v. Behnke*, 155 Wis. 2d 796, 456 N.W.2d 610 (1990), defense counsel was not present when the jury returned, and the defendant said "no" when asked by the trial court if he wanted to poll the jurors individually. The supreme court held that whether the constitutional violation was viewed as a denial of counsel or ineffective assistance of counsel, automatic reversal was required because the defendant did not knowingly, voluntarily and unequivocally waive the right to counsel or the right to poll the jury. *Id.* at 806, 456 N.W.2d at 614. The deficient performance in *Behnke* was counsel's failure to be present when the jury returned its verdict.

[10] *See* WIS J I—CRIMINAL 515.

745

explained to the defendant the right to an individual polling.

The relevant circumstances in this case are that the court read the standard jury instruction on a unanimous verdict before the jury began its deliberations. The jurors answered affirmatively when the court read their verdict and asked if it was their verdict by raising their hands to so indicate. The only question the jurors had during deliberations was this: "In the Rochester incident, did the alleged sexual abuse take place after Adrian came back from Christmas vacation?" The trial court discussed the appropriate answer with the prosecutor and defense counsel. The prosecutor pointed out that Paulette had testified that Adrian was in Rochester, went back to La Crosse for a period of time and returned to Rochester for the Christmas vacation, but that Adrian was not specific on the dates. Both counsel agreed with the trial court that the appropriate response to the jury was that it should rely on its collective memory of the testimony. Yang argues, in one sentence, that this question indicates the jury's verdict was not unanimous, but we do not see the connection.

In the absence of any indication that the jury's verdict was not unanimous, we conclude the decision not to request an individual polling was a reasonable one in the circumstances of this case and was not deficient performance. Yang is therefore not entitled to an evidentiary hearing on this claim.

*By the Court.*—Judgment and order affirmed.

SUNDBY, J. (*dissenting* ). Defendant-Appellant Xiong Yang obtained a fourth-grade education in Laos,

where he was born in 1960. He and his family fled Laos in the wake of the takeover of the government by the Pathet Lao and the subsequent persecution of the Hmong. He studied English at Western Wisconsin Technical College. A teacher's aide described the first course that Yang took as "survival English[:] Learning how to read signs on men's and women's bathrooms, learning how . . . to say hello, how are you, I'm fine, this is a nice day, this is a table, this is a chair. Real survival English." The second-level English course Yang took was more advanced, but did not contain vocabulary comparable to that an average kindergartner possesses. The teacher's aide described Yang's English ability as follows: "[I]f people would speak in slow sentences and basic, real basic English, Xiong could understand, but unless [they were] speaking slowly and in very basic English like you would to a small child, it wouldn't be understood."

Yang was convicted of sexual contact with a child. He filed a postconviction motion asking for a new trial, claiming he did not understand the proceedings and that the trial court should have appointed an interpreter to assist him. Alternatively, he alleged that his counsel was ineffective for failing to obtain an interpreter for him. The trial court denied his motion.

On appeal, Yang asks that we remand this case to the trial court to determine whether he was denied effective assistance of counsel because counsel did not poll the jury individually and did not inform him that he had a right to such polling. We permitted Yang to raise this request in his appellate reply brief. Because I would grant the remand, I respectfully dissent.

The majority concludes that when a defendant is represented by counsel, the decision whether to poll the jury may be made by counsel without informing the

defendant of that right. The majority cites *State v. Jackson*, 188 Wis. 2d 537, 542-43, 525 N.W.2d 165, 168 (Ct. App. 1994), where we said: "Jackson was represented by counsel when the verdict was entered, and the decision to assert or waive certain rights, including whether to poll the jury, was delegated to that counsel." The majority misreads *Jackson*. All that we held was that it was not error for the trial court to fail to inquire of the defendant personally whether he or she wished to have the jury polled. *See id*. at 539-40, 525 N.W.2d at 166. We did not hold, however, that failure of trial counsel to discuss this very valuable right with his or her client was not deficient performance. Indeed, in view of our writings and the supreme court's writings as to the value of polling the jury, the proposition that counsel need not discuss this right with his or her client is startling. In *State v. Wojtalewicz*, 127 Wis. 2d 344, 379 N.W.2d 338 (Ct. App. 1985), we said: "The defendant's right to poll the jury has been described as '[t]he most substantial right of the accused in a felony case.' " *Id*. at 348, 379 N.W.2d at 340 (quoting *Boreing v. Beard*, 10 S.W.2d 447, 451 (Ky. Ct. App. 1928)). In *State v. Behnke*, 155 Wis. 2d 796, 456 N.W.2d 610 (1990), the supreme court approved our holding in *Wojtalewicz*, stating: "The right to poll the jury at the return of the verdict is a corollary to the defendant's right to a unanimous verdict . . . . The right to poll the jury is intertwined with the defendant's constitutional right to counsel at the return of the jury verdict." *Id*. at 801-02, 456 N.W.2d at 612 (citing *Smith v. State*, 51 Wis. 615, 8 N.W. 410 (1881)).

The defendant's right to poll the jury is not merely one of those abstract constitutional rights which is of little or no practical value. In *State v. Cartagena*, 140 Wis. 2d 59, 409 N.W.2d 386 (Ct. App. 1987), a juror

748

changed his mind overnight after the verdict had been sealed and dissented before the verdict was accepted. We concluded that the sealed verdict lost its validity. *Id.* at 63, 409 N.W.2d at 388. In *Jackson*, I pointed out that the Criminal Benchbook Committee recommends that the trial court poll the jury in every case. 188 Wis. 2d at 543, 525 N.W.2d at 168 (citing WISCONSIN JUDI CIAL BENCHBOOK, CR 25-3 (1994)) (Sundby, J., concurring).

It is especially important that this important right be carefully explained to a defendant who is of limited intelligence or does not have a firm grasp of the English language or any understanding at all as to how the criminal justice system works. I would therefore grant Yang's request to remand this case to the trial court for a hearing as to whether trial counsel informed Yang of his right to poll the individual members of the jury and whether Yang understood the purpose of such polling.

If there is a petition for review of our decision, I urge the supreme court to grant review to clarify the respective rights and responsibilities of trial counsel and the trial court with respect to this important right. Our decisions are not consistent. As the majority opinion notes, Majority op. at 738–39 n.8, in *State v. Reichling*, No. 94-1818-CR, unpublished slip op. (Wis. Ct. App. July 6, 1995), we initially held that the defendant's right to poll the jury was personal to the defendant, and counsel was deficient if he or she failed to inform the defendant of this right. Subsequently, we withdrew this opinion and on September 28, 1995, reissued our opinion in which we held that when counsel is present with the defendant when the jury returns its verdict, failure to inform the defendant of his or her right to poll jurors individually is not, in itself, deficient performance. *State v. Reichling*, No. 94-

1818-CR, unpublished slip op. (Wis. Ct. App. Sept. 28, 1995).

Perhaps the simplest way to avoid this confusion and recognize that the right to poll the jurors individually is a valuable right, is for the supreme court to make mandatory the recommendation of the Criminal Benchbook Committee that the trial court poll the jurors individually in every case.