Terry K. STROOK, Plaintiff-Respondent,

v.

Dean KEDINGER, Defendant-Appellant.

Court of Appeals

*No. 2007AP2898. Submitted on briefs October 23, 2008.
—Decided February 18, 2009.*

2009 WI App 31

(Also reported in 766 N.W.2d 219.)

549

550

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jeremy Vanderloop* of *Storck & Madden* of Mayville.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peter John Hoeper* of *Hoeper Law Offices* of Waupun.

Before Brown, C.J., Anderson, P.J., and Neubauer, J.

¶ 1. BROWN, C.J. This is a "chicken or the egg" case. More precisely, when a person who must appear in court at a substantive proceeding, seeks an accommodation because of physical disability, and self-identifies in as reasonable a time as possible before the hearing, should circuit courts who believe they need more information before deciding whether and what accommodation to give, make a factual determination *before* the date of the substantive court hearing, either by informal means or by a formal hearing with notice to the person alleging a disability? Or, may the circuit courts maintain silence about the accommodation request and decide the accommodation request *at* the substantive hearing? We hold that, as a matter of common sense, fairness and due process, the answer is the former. We reverse because the circuit court in this case used the latter and that latter process prejudicially affected the disabled person's right to a fair hearing. We also reverse for other, correlative reasons.

¶ 2. Dean Kedinger alleges that he is deaf. He may even be Deaf (with a capital D). More on that later. This case is mainly about the facts and circumstances surrounding his attempt to have a sign language interpreter at a motion hearing. An interpreter for this hearing was important because the subject matter was substantive: Kedinger's motion to dismiss Terry Strook's complaint and Strook's motion to strike Kedinger's cross-claims and counterclaims were on the line. Summarily, what happened was that when Kedinger was informed that he would not be afforded an interpreter at the hearing, he refused to appear. We note that the motion hearing was before the Hon. Richard J. Nuss. Judge Nuss struck Kedinger's cross-claims and counterclaims. The Hon. Karen L. Seifert presided at the resultant trial to the court and a sign language interpreter was afforded Kedinger at that trial. The trial is not our concern. Rather, because Judge Nuss' pretrial order prohibited Kedinger from prosecuting his cross-claims and counterclaims, Kedinger was not able to present his claims at trial. The motion hearing is where he claims the prejudice lies and, therefore, the trial before Judge Seifert is not material to this appeal. Thus, when we use the term "circuit court," we will be referring to Judge Nuss.

## BACKGROUND

¶ 3. To completely understand the issue at bar, it is important to set forth the somewhat lengthy history leading up to this appeal. The basic underlying facts leading to the dispute between the parties are simple enough. Strook and Kedinger are neighbors. Kedinger downed trees on their shared property line, some of which were on Strook's side. Strook claimed that Kedinger was trespassing, but Kedinger claimed that he

had consent. Kedinger also claimed that Strook had trespassed on and damaged his property. It is not these facts which need to be parsed out, but rather the procedural history that we need to relate in admittedly great detail.

¶ 4. Strook filed his complaint for trespassing on March 2, 2006. On April 21, Kedinger, acting pro se, responded with answers, cross-claims and counter-claims and, by a separate document, also moved to dismiss the complaint. On May 5, Strook replied and also moved to strike. On May 12, Kedinger filed a jury demand with a petition for waiver of filing and service fees. Attached was an affidavit of indigency stating that Kedinger currently received food stamps, along with proof that food stamps were issued to him from February 2005 to January 2006. The same day, he also filed a letter from his doctor that stated:

> [Kedinger] is deaf and ... requires a sign language interpreter for effective communication. The exception would be written communication which is not always optimally effective in complex matters. It is, of course, slower and more cumbersome ....
>
> In particular, for legal proceedings, I would encourage you to provide a sign language interpreter for him.

For the next month, nothing happened in the case.

¶ 5. Then, over a month later, on Friday, June 16, the circuit court mailed the parties a notice that it had scheduled a motion hearing for June 22 on the motions to dismiss and motions to strike. It stated that the court would not adjourn the matter "except upon formal motion for good cause shown or with the specific approval of the court upon stipulation by all parties." The notice also provided a phone number for those with disabilities. It should be noted, as we will later detail by

footnote, that the notice period was abridged, shorter than generally provided for by the statutes. However, the circuit court was shortly thereafter taking medical leave and wanted this motion heard before its extended absence. While this shortened notice is allowed by statute and is within the discretion of the circuit court, we note that it may well have contributed to the problem that is now before this court on appeal.

■

¶ 6. On Tuesday, June 20, Kedinger called the court via TTY.[2] He learned that the court would not provide an interpreter at the motion hearing, so he told the court staffer who took the call that he would not attend the hearing. The next day, he filed a formal motion for a sign language interpreter, again asserting that he was deaf. In it, he informed the court that he would not be attending due to not having an interpreter as requested. We quote this motion in pertinent part, in a footnote, because it helps explain the circuit court's reaction to this motion as part of its ultimate decision in this case. Suffice it to say, certain passages in the motion show a lack of respect for the justice system in general and the circuit court in particular. Venom, arrogance and *ad hominem* attacks are not to be condoned, whether they are by a member of the prac-ticing bar or a person acting pro se.[3]

---

[2] A deaf or speech impaired person can make telephone calls using a Teletypewriter (TTY). With a TTY, the conversation is typed rather than spoken.

[3] Kedinger's Notice and Motion for Interpreters stated, in pertinent part:

Council and Honorable Judge in these matters: *I will NOT be showing up for the 6/22/06 Motion Hearing, due to court not having an interpreter as requested.*

¶ 7. The circuit court held the hearing as scheduled. Kedinger was absent, like he said he would be, but the court still discussed the merits of his motion to

1. It has come to the notice of the defendant that it appears the court has not been diligent in its duties as Judge in these maters. The defendant D. Kedinger has filed Motions in the past asking for dismissal on April 21, 2006, with no response. The Court has now had over 90 days to wake up to what this really is and sign it, or answer it in Motion Practice.

2. On Apx. May 11th, 2006 I filled papers for Jury demand and affidavit of Indigence and order under §§ 814/29, of which so far the court has ignored, thus preventing the defendant from filing Third-Party Defendants papers on June 16th, 2006 (within the legal restraints for doing so).

3. On May 11th, 2006 I also filed proof of hearing impairment from a doctor to justify my right to have legal interpreters for all hearings. The grounds for this Motion are that any statements or arguments made for *denial are ambiguous* for the following reasons that they do not comply with ADA law Title II of the ADA act of 1990 that prohibits State and local government from discrimination against an individual with a disability that are bound by this Federal law. The law requires that you give primary consideration to the individual's preference as to how the person wishes to communicate and requires that you honor the individual's choice. My rights under (ADA), 42 USC §§ 12101–12213, effective as I wish . . . .

. . . .

4. This must be as effective as your communication with hearing people, in other words as well as those who do not have hearing impairments. I will **NOT** be voicing, except by my choice when and where as I chose *as allowed by law,* and **my legal right**, as I do not know the quality of my voice, and will not allow you to make me look stupid for your enjoyment and others.

dismiss and claims, along with his indigency and interpreter petitions. The court struck his counter and cross claims, dismissed his motion, denied his petition for waiver of jury fees due to insufficient information, and held that the interpreter motion was untimely and would place an undue burden on the county. This is what the court said, in pertinent part:

5. Any hearing without me and a legal interpreter present will be viewed as **ex-parte communications**, it has already been proven to me in the past with my ex-wife and clerk of courts at that time and an officer of the law (that she had do her skullduggery for her with the court), & that you and several Judges in Fond du lac County have *exposed themselves to violating the following* SCR 60 ethics rules, as follows; 60.02, 60.03, 60.04 and has proven 757.19(2g) in the kind of response given, among others yet known.

6. If you wish for this to take years in place of months, (which it may anyway), and that is your desire, then you are once again taking advantage of the system at taxpayer's undue expense. This to me is use and abuse of the system and adds up to collusion in with the defendants, this done *without* interpreters would create undue depression and would limit my knowledge of what is all happening in the room and why, **and** for the purpose *"To limit my testimony and evidence against the defendants, done by design in skullduggery"*, (and yet you do not learn from your past). I now again suffer a heart conduction, as a effect of consequence, as this County's actions result may yet again in another heart attack, This all again because you are **too cheap to pay for an interpreter(s)** and that is why we are here in the first place, at this point in time.

 **"All of my case(s) is and are a conflict of interest for *every Judge* in this County and all surrounding areas as a result of dishonest Knavery and Skullduggery used."**

(Quoted verbatim from motion.)

556

First . . . the mere fact that somebody has a disability, regardless of what it might be, does not trump that person's obligation to make their court appearance and certainly be heard on the subject. And to just summarily, unilaterally not show up and tell the Court this is what it's going to do and this is the way you're going to do it, this Court takes particular affront to. It is not for any litigant to dictate to Court how, what, when, where and why, and I think that is what Mr. Kedinger has now chosen to do.

So this Court had every reason to engage in some dialog with him this afternoon as to his alleged deficiency of hearing, because this court takes particular exception to his ongoing position that he . . . fails to communicate, he cannot communicate with anyone. The court certainly senses, based upon conversations that it had with the court staff up here, and others, that Mr. Kedinger for all practical purposes, picks and chooses his deficit, and how [he] uses it, and how he employs it, and when he wants to use it, and when he wants to employ it. That there are times that he can engage in a meaningful conversation with an individual. But when it gets down to something that requires judicial intervention, then all of the sudden the magnitude of his deficiency rises.

There is no . . . way that this Court would be in a position to responsibly assess Mr. Kedinger's deficiency unless he in fact was in court so this Court can certainly observe him, query him, permit him to be heard and do the things that are necessary to determine whether or not there is some legitimacy in this.

The court received Exhibit 1 [the Doctor's letter] and [it] certainly does not deny [that] this Court [can] engage in some written dialog with Mr. Kedinger as to some of these issue[s], and I intended to probably do that. But Mr. Kedinger is not here. And so the doctor himself indicates that that is—while it's cumbersome, it certainly would be permissible.

557

And so the Court would certainly make a definitive finding that Mr. Kedinger's rights would not be just summarily compromised by this motion hearing moving ahead this afternoon while he may have some deficiency and there may not be an interpreter present.

¶ 8.　The circuit court then discussed a sheriff's department incident report where a backhoe operator informed a deputy that he was able to "easily" communicate with Kedinger. The circuit court apparently accepted this as proof that Kedinger asserts a disability only when it suits his purpose. The court then went on to state:

> The Court wants to emphasize that Mr. Kedinger has repeatedly exasperated the resources of this court system in an attempt to demonstrate and show that he has some compelling disability that prevents his inability to communicate, short of certified deaf sign language interpreting. This Court takes particular exception to that if it doesn't even have an opportunity to hear and to see. And if a defendant or a party with such a disability just absents himself from the court, then he should not be given the—the right to have a court just acquiesce to that disability or the significance of that disability. [The Court will] certainly find, based upon the best evidence the Court has, that quite possibly this hearing could have proceeded this afternoon without an interpreter, given the directive from the doctor, given how this Court was willing to engage with . . . Mr. Kedinger, and Mr. Kedinger has on his own elected to strip the Court of that authority.
>
> Does that mean that this Court should then just summarily adjourn this hearing and so advise Mr. Kedinger? No. This matter was properly noticed, timely noticed, and Mr. Kedinger elected that he just isn't going to come. He has so much told the Court in his motion what the facts of life are, and that is the way it

is going to be. And this Court, once, again, certainly finds that there is absolutely no justification for any litigant to arbitrarily make such directives to the Court . . . .

¶ 9. The circuit court then explained on the record that it understood how Kedinger appeared in the small claims office and was able to communicate with the staff by using written communication, back and forth. And he also was able to communicate verbally with a clerk in the family court commissioner's office. This latter conversation was overheard by a sheriff's deputy, who personally told the circuit court that it was a "normal conversation." Whether Kedinger "read lips" the court did not know. But the circuit court used this out-of-court occurrence as evidence that "[i]t just shows the complete lack of credibility of Mr. Kedinger's alleged deficiency with regard to his hearing defect." After again explaining that Kedinger had a duty to come to the motion hearing and prove his disability to the satisfaction of the court, and again opining that Kedinger only relies on the disability card when it comes to court proceedings, the circuit court denied Kedinger's motion to dismiss and "in the same vein" granted Strook's motion to strike.

¶ 10. But even after having ruled, the court came back to the subject. Again, the court sounded out the above-described themes, but added something new. The court surmised that, outside the courthouse, Kedinger "walks into a store, buys a loaf of bread, puts gas in his car, pays his bills, engages in normal affairs of everyday life. He doesn't have an interpreter on his arm, and somehow he survives." But when it comes to a court proceeding, he all of the sudden needs an interpreter. The court then said that

to just continually . . . abuse the legal system . . . with this repeated request for interpreters [is] unjustified [and] an undue economic burden on the county. It impedes the legal process. It's not right and it's not fair, and no one should just be able to on their own make those self-elections without presenting themselves to the jurisdiction of this Court. Mr. Kedinger has done so, but he has done so at his peril.

¶ 11. Finally, in its written "findings and orders" following the hearing, the circuit court wrote, in pertinent part:

The court further finds that the Motion for Interpreters is without merit, and that there is a serious question as to the integrity of the request, and that the court would require the defendant to be present in order that the court could personally evaluate the legitimacy of the request for interpreters, to make a determination as to whether or not the same represents an undue economic burden on the county; again, in view of the defendant's non-participation, the court has no choice but to make this ruling on the best evidence.

## DISCUSSION

### *The Law*

¶ 12. We begin, as we must, with the law. The right to an interpreter in Wisconsin was first established in a criminal case, *State v. Neave*, 117 Wis. 2d 359, 344 N.W. 2d 181 (1984), *abrogated on other grounds by State v. Koch*, 175 Wis. 2d 684, 499 N.W.2d 152 (1993). Our supreme court decided, as a matter of judicial administration (rather than on a constitutional basis), that fairness required a criminal defendant to be given the assistance of an interpreter when needed. *See*

*id.* at 361, 365. The court reasoned that the assistance of an interpreter also promotes judicial economy by reducing the risk of appeal premised upon ineffective assistance of counsel, inability to reasonably understand testimony resulting in a loss of an effective right to cross-examination, or improper waiver of the right to an interpreter. *Id.* at 365. The factual determination of the need for an interpreter was held to be within the discretion of the circuit court. *Id.* at 364.

¶ 13. In *State v. Yang*, 201 Wis. 2d 725, 549 N.W.2d 769 (Ct. App. 1996), this court stated that, even though the determination of whether a defendant requires an interpreter is in the hands of the circuit court, the circuit courts of our state nevertheless have certain responsibilities in that regard. *Id.* at 732. This court noted that, once a circuit court has notice of a language difficulty such that the ability to understand testimony or make him or herself understood may be a problem, it has an *obligation* to make a factual determination on the need for an interpreter. *Id.*

¶ 14. Wisconsin statutes subsequently codified the process. WIS. STAT. § 885.38 (2007–08).[4] This process is set forth in a footnote.[5] It should be noted that,

---

[4] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

[5] WISCONSIN STAT. § 885.38(3)(a) (2007–08) provides that:

> If the court determines that the person has limited English proficiency and that an interpreter is necessary, the court shall advise the person that he or she has the right to a qualified interpreter at the public's expense if the person is one of the following:
>
> 1. A party in interest.
>
> 2. A witness, while testifying in a court proceeding.
>
> 3. An alleged victim, as defined in s. 950.02(4).

effective October 27, 2007, an interpreter *"shall"* be provided where necessary in *all* substantive court proceedings. 2007 Wis. Act. 20, § 3773. But at the time of the motion hearing in the case at bar, the reach of the statute requiring an interpreter was limited to criminal, juvenile and mental health cases. Sec. 885.38(3)(a) (2005–06). Nonetheless, even at the time of the hearing, the circuit court had the authority to authorize the use of a court interpreter in other cases. Sec. 885.38(3)(f).

¶ 15. Moreover, quite apart from the Wisconsin case law and WIS. STAT. § 885.38, the Americans with Disabilities Act (ADA)—even at the time of the circuit court hearing—*required* an interpreter when one was necessary. State courts are bound by the Federal Americans with Disabilities Act. *See* 42 U.S.C.A. § 12132; 28 C.F.R. § 35.102. Section 885.38(3), as it existed at the time of the hearing, violated that Act.[6] The Federal Act

---

4. A parent or legal guardian of a minor party in interest or the legal guardian of a party in interest.

5. Another person affected by the proceedings, if the court determines that the appointment is necessary and appropriate.

Section 885.38(1)(b) (2007–08) provides that limited English proficiency means:

1. The inability, because of the use of a language other than English, to adequately understand or communicate effectively in English in a court proceeding.

2. The inability, due to a speech impairment, hearing loss, deafness, deaf-blindness, or other disability, to adequately hear, understand, or communicate effectively in English in a court proceeding.

[6] In 2007 Wis. Act. 20, § 3773, the legislature amended WIS. STAT. § 885.38(3)(a) to bring it in compliance with the Federal Americans with Disabilities Act. This amendment revoked the court's discretion, making the appointment of a qualified inter-

places the same requirements on a court regardless of what type of case it is. Therefore, it is incumbent on our courts to follow the mandates of the Federal Act.

¶ 16. Title II of the 1990 Americans with Disabilities Act commands that state courts take "appropriate steps" to ensure that communication with a disabled person is as effective as communication with others. 28 C.F.R. §§ 35.160(a), 35.101. For a person who is deaf or hard of hearing, this means the court must provide an auxiliary aid such as a qualified interpreter. 28 C.F.R. §§ 35.160(b)(1), 35.104. And, the court must give "primary consideration" to the disabled person's choice of auxiliary aids. 28 C.F.R. § 35.160(b)(2). The only limit to these provisions is 28 C.F.R. § 35.164, which provides that a public entity is relieved of its duty only upon proving that, considering all funding and operating resources available, the proposed action would result in either (1) a fundamental alteration in the nature of the service, program or activity or (2) undue financial or administrative burdens, based on all resources available for use in the program. The court has the burden to prove the exception, and must explain, in writing, why it reached its conclusion. *Id.*

■

¶ 17. Finally, we would be remiss if we did not at least note the constitutional dimension in all of this. It is axiomatic that all litigants be able to understand the proceedings. If a person is unable to hear and understand, that person is unable to participate, and if unable to participate, it is a denial of due process under the

preter mandatory in *all* state circuit and appellate cases. *Id.* It also clarified that the public must always bear the expense of providing a qualified interpreter. *Id.* at § 3773–74.

Fifth and Fourteenth Amendments. *See United States ex rel. Negron v. New York*, 434 F.2d 386, 389 (2d Cir. 1970).

¶ 18. Therefore, considering the Wisconsin law existing at the time, the ADA and the constitutional right to due process in totality, it was the circuit court's obligation to conduct a fact hearing to determine Kedinger's need for an interpreter.

### Applying the Facts to the Law

■

¶ 19. As noted in the statement of facts, the circuit court in this case lamented that Kedinger had chosen not to appear at the substantive hearing because, as it said on the record, it had "every reason to engage in some dialog with him this afternoon as to his alleged deficiency of hearing . . . ." Therein lies the first problem. There is nothing in the record which would show that the circuit court set the matter for a hearing on the need for an interpreter. There was no order, no indication, nothing.

¶ 20. Even if there had been something in the record to show that the court was going to have such a hearing, nobody told Kedinger that the issue of whether to appoint an interpreter would be a topic of discussion by the court at the substantive hearing. We have searched the record high and low for such a statement. Again, we have been unable to find any reference. All we can find is Kedinger's formal written request for an interpreter where he alleged that he had called the courthouse and had been told by someone that the court would not provide him with an interpreter. We must conclude that, not only was a hearing not set, but no notice was given to Kedinger that there would be a hearing on the need for an interpreter.

¶ 21. Once Kedinger properly notified the court that he needed an interpreter, *Yang* and the ADA required the court to act on that request—either by obtaining an interpreter or setting a hearing date so that the need for an interpreter could be determined. Since there is no record showing that a hearing to determine the need for an interpreter was on the docket, we must reverse on that ground alone.

¶ 22. As well, taking the circuit court's word that it intended to have a "dialog" with Kedinger at the substantive hearing on the need for an interpreter, Kedinger, as we just noted, never received notice that the court would be entertaining the accommodation request at that time. Even taking into account Kedinger's somewhat insulting, mercurial written statement that he would refuse to appear at the substantive hearing because no interpreter was going to be present, he at least deserved notice that the court would take up the issue at the time of the substantive hearing. Not only did due process demand it, but so did the interests of justice. The accommodation issue was an issue put in controversy by the circuit court. As such, it was a real issue in controversy that had to be heard. But no one told Kedinger. So, the real issue in controversy was never heard. Therefore, in addition to *Yang*, the ADA, and due process, we exercise our prerogative under Wis. Stat. § 752.35 to reverse in the interests of justice.[7]

---

[7] The court of appeals is vested with the discretionary power to order a new trial by Wis. Stat. § 752.35, which provides:

> In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of

¶ 23. We also hold that the circuit court's apparent intention to hear the interpreter issue and the substantive issue simultaneously, was an improper exercise of discretion. The court forms emanating from the Fond du Lac courts, like the forms in all or practically all the circuits in this state, ask parties to contact the court if they need an accommodation due to disability. The whole purpose behind this inquiry is to foster self-identification of those who have disabilities and need an accommodation. It allows the courts to determine the need for an accommodation in an orderly and efficient manner and to make whatever factual inquiry is necessary. If an accommodation is found to be necessary, it allows the courts to have everything in place *before* the date of the substantive proceeding. Otherwise, if the accommodation hearing takes place on the same day and same time as the substantive hearing, the court runs the risk that the hearing will have to be postponed should it be determined that an accommodation is needed. It simply makes no sense, from a judicial efficiency standpoint, to have the accommodation hearing on the same day as the substantive hearing if the disabled person has self-identified and asked for an accommodation beforehand.

¶ 24. We note that the *Yang* court spoke to this concern. The court wrote:

> We conclude that a court has notice of a language difficulty within the meaning of § 885.37(1)(b), STATS.,

whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

566

when it becomes aware that a criminal defendant's difficulty with English may impair his or her ability to communicate with counsel, to understand testimony in English, or to make himself or herself understood in English. *At that point,* the court has an obligation to make the factual determination on the need for an interpreter required under § 885.37(1) (b).

We appreciate the trial court's concern with minimizing unnecessary and premature determinations on the need for an interpreter. However, since the determination does not require an elaborate proceeding, we believe our interpretation of § 885.37(1), STATS., will aid judicial administration by establishing the need for an interpreter, if there is one, *earlier rather than later* in the criminal process.

*Yang,* 201 Wis. 2d at 734–35 (emphasis added). Therefore, our court has already spoken to the need for an early decision on the need for an interpreter for a hearing or trial where liberty interests are to be determined. This same reasoning, as a matter of common sense, should also apply when property interests are at stake.

¶ 25. Relatedly, we must also look at this issue through the lens of the disabled person. If the hearing on whether to provide an accommodation is scheduled at the time of the substantive hearing itself, we place the allegedly disabled person between the proverbial "rock and the hard place." One can only imagine the fear and confusion that a person with a disability might have if required to appear at an important proceeding to determine liberty or property interests not knowing whether the requested accommodation is going to be granted. Courts are public entities that must be accessible to all. We must assure that, if a person *is* disabled and *needs* an accommodation to have access to the

courts, then that disabled person should not have to worry about access issues when preparing for the substantive hearing. To do otherwise is no way to conduct judicial business. The hearing on the accommodation should precede the substantive hearing.

■

¶ 26. We are not done yet. After reading the record thoroughly, we are satisfied that the circuit court's comments appear to show how denial of a sign language interpreter was a foregone conclusion even had Kedinger appeared. The court recounted its belief, almost all of it from hearsay, that Kedinger "picks and chooses his deficit," that his own doctor explained how passing written notes back and forth would suffice and that the court "intended to probably do that," and that Kedinger was capable of "normal conversation" in any event. From the record, it appears to this court that the circuit court had already made up its mind that there would be no interpreter and that the court would proceed by passing written notes back and forth. We are also mindful that adjourning the matter so as to obtain an interpreter would have thwarted the whole purpose behind the circuit court's notice for the hearing, which was to hear and decide this matter before the court's medical leave began.[8]

---

[8] WISCONSIN STAT. § 801.15(4) requires courts to provide the parties at least five days notice before holding a hearing on a written motion. When the notice period is less than eleven days, courts must exclude weekend days. Sec. 801.15(1)(b). Courts must also exclude the day of the notice. *Id.* Moreover, § 801.15(5)(a) states that, when notice is by mail, the court must add three days to the five day notice period.

Here, the circuit court mailed notice on Friday, June 16, 2006, that it would hold a motion hearing on June 22, 2006.

¶ 27. In coming to its apparent conclusion that it would have conducted the hearing without the need for an interpreter, some assumptions were made by the circuit court that this court finds troubling. For example, the court thought Kedinger could probably "lip read." Our initial problem with this is that the record is devoid of any support for this conclusion, other than assumption and hearsay. But more importantly, the court's statement shows that the circuit court is misinformed about the value of "lipreading." As one commentator wrote, the ability to lip read is more a function of myth than fact. *See* Jo Anne Simon, *The Use of Interpreters for the Deaf and the Legal Community's Obligation to Comply with the A.D.A.*, 8 J.L. & HEALTH 155, 175–76 (1994). While many deaf people can lip read to some extent, only 25% to 40% of the English language is visible on the lips in the best of conditions. *Id.* at 176. It is seldom sufficient in and of itself. *Id.* Another commentator noted that one study found that the best lip readers (or, more preferably "speech readers") could fully comprehend only 26% of what was said to them. Deirdre M. Smith, *Confronting Silence: The Constitution, Deaf Criminal Defendants, and the Right to Interpretation during Trial*, 46 ME. L. REV. 87, 97 (1994).

Notice by mail requires eight days, excluding weekends. WIS. STAT. § 801.15. June 17 and 18 fell on a weekend. Therefore, to hold a motion hearing on June 22, 2006, in compliance with § 801.15, the circuit court would have had to mail the notice on June 12, 2006. Since the court mailed its notice June 16, it sua sponte shortened the notice period by four days. However, a circuit court has the inherent power to control its calendar and scheduling and may shorten the five-day notice period. *Schopper v. Gehring*, 210 Wis. 2d 208, 215, 565 N.W.2d 187 (Ct. App. 1997). Nonetheless, even in such a case, each party must have fair opportunity to prepare and be heard. *Id.*

¶ 28. Courtroom settings provide an excellent example of the limitations of speech reading. *Id.* at 98. The speaker may be at a distance from the deaf person and, if there are several participants in the proceeding, the speaker may be turned away from the deaf person. *See id.* As well, the courtroom setting and decorum eliminate many visual clues used by deaf people who speech read. *Id.* The use of legal terms and other words unfamiliar to lay persons can further limit understanding. *Id.* For example, professional jargon contains many words and phrases that would be incomprehensible to one who is speech reading. *Id.* This is why, even if a deaf person can find ways to communicate outside the courtroom, as the circuit court in this case alluded to, it is a stretch for the court to reason that the person can then also adequately communicate inside the courtroom.

¶ 29. Writing notes back and forth is also an inefficient and ineffective method of communicating in the courtroom. People, hearing or deaf, tend to condense what they would say in other modes when they are writing notes, which could be extremely prejudicial in legal settings. *Id.* And, many deaf people have a reading level well below average. *Id.* Moreover, English is a second language to most deaf people who lost their hearing during childhood.[9] *Id.*

---

[9] We are also troubled by Strook's argument in his brief that if Kedinger could communicate with the clerk of court's office by telephone, he can communicate in the courtroom. As we noted, the phone call was made by use of a teletype device called a TTY. That would hardly be evidence that he can communicate in the courtroom. Deaf people have many ways of communicating by telephone due to modern technology. But that does not even begin to answer the communication needs in the courtroom.

¶ 30. We do not know the extent of Kedinger's ability to communicate. He may be part of the deaf population or the Deaf population. The deaf population in the United States is divided roughly into two groups, those who are members of the Deaf community and those who are not. Simon, *supra* ¶ 27, at 159, 161. The two groups fall roughly in line with another very important distinction: prelingual and postlingual, or adventitious deafness. *Id.* at 159. Prelingually deaf persons were either born deaf or lost their hearing before they learned language—roughly before the age of three. *Id.* When the time between birth and three years is interrupted by hearing loss, the natural time to learn the spoken language is often lost. *Id.* Many of these persons make up the "culturally deaf" portion of the deaf population in the United States and current deafness literature refers to them as Deaf, with a capital "D". *Id.* at 160–61. Many of the culturally Deaf use American Sign Language to varying degrees of comprehension. *Id.* Those deaf people who lost their hearing later in life, on the other hand, may well have learned a spoken language and used it as their primary language. *Id.* at 159–60. Thus, these deaf people, with a small "d", may be better able to understand the English language. *Id.* However, even these people, have communication difficulties to varying degrees and may use American Sign Language as their preferred form of communication. *Id.*

¶ 31. It is up to the circuit court on remand to discover Kedinger's capabilities and the best form of communication and go from there. But whatever his capabilities are, the circuit court must be cognizant not only of our statutes and case law, but also the ADA and, pursuant to the ADA, must give "primary consideration" to Kedinger's preferred method of communica-

tion. If Kedinger's first language is English and he reads English well, perhaps the accommodation of a realtime reporter might be amenable to both Kedinger and the court—after considering the resources available and comparing the costs of each accommodation. That will have to be decided by the circuit court on remand.

¶ 32. To assist the court on remand, we offer the commentary of Professors Michelle LaVigne and McCay Vernon, in their article *An Interpreter Isn't Enough: Deafness, Language and Due Process*, 2003 Wis. L. Rev. 843. This is a thorough and thoughtful primer for how to assess a deaf person's abilities and needs. We will not dwell at length about the article here, but cite it for information purposes. It is sufficient if we point out that, on remand, the appropriate way to perform a colloquy with a hearing disabled person, according to Professors LaVigne and Vernon, is to directly ask open-ended questions to determine what that person understands. *Id.* at 925. The court should deviate from the standard script of "yes-and-no" type colloquies that permeate so many of our judicial tasks and instead engage in conversational dialogue based on questions to which the court already knows the answer. *Id.*

¶ 33. We reverse the judgment entered after the trial by Judge Seifert because that trial was prejudicially infected by what occurred pretrial. We also reverse the order entered by Judge Nuss. On remand, the court shall consider Kedinger's needs for an interpreter, have a new hearing on the motions to dismiss, to strike, indigency and demand for jury trial and proceed from there.

*By the Court.*—Judgment and order reversed and cause remanded with directions.